# COVINGTON AND LEXINGTON TURNPIKE ROAD COMPANY v. SANDFORD.

## ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 50. Submitted May 7, 1896. — Decided December 14, 1896.

The legislature of Kentucky, by an act passed in 1834, created the Covington and Lexington Turnpike Road Company with authority to construct a turnpike from Covington to Lexington. One section prescribed the rates of tolls which might be exacted; another provided " that if at the expiration of five years after the said road has been completed, it shall appear that the annual net dividends for the two years next preceding of said company, upon the capital stock expended upon said road and its repairs, shall have exceeded the average of fourteen per cent per annum thereof, then and in that case, the legislature reserves to itself the right, upon the fact being made known, to reduce the rates of toll, so that it shall give that amount of dividends per annum, and no more." In 1851 two new corporations were created out of the one created by the act of 1834, one to own and control a part of the road, and the other the remaining part, and each of the new companies was to possess and retain "all the powers, rights and capacities in severalty granted by the act of incorporation, and the amendments thereto, to the original company." In 1865 an act was passed reducing the tolls to be collected on the Covington and Lexington turnpike. In 1890 another act was passed largely reducing still further the tolls which might be exacted. *Held,*

(1) That the new corporations created out of the old one did not acquire the immunity and exemption granted by the act of 1834 to the original company from legislative control as to the extent of dividends it might earn;

(2) That the statute of Kentucky passed February 14, 1856, reserving to the legislature the power to amend or repeal at will charters granted by it, had no application to charters granted prior to that date;

(3) That an exemption or immunity from taxation is never sustained unless it has been given in language clearly and unmistakably evincing a purpose to grant such immunity or exemption;

(4) That corporations are persons within the meaning of the constitutional provisions forbidding the deprivation of property without due process of law as well as a denial of the equal protection of the laws;

(5) That the principle is reaffirmed that courts have the power to inquire whether a body of rates prescribed by a legislature is unjust and unreasonable and such as to work a practical destruction of rights

of property, and if found so to be, to restrain its operation, because such legislation is not due process of law;

(6) That the facts stated make a *prima facie* case invalidating the act of 1890, as depriving the turnpike company of its property without due process of law. Where a defence arises under an act of Congress or under the Constitution, the question whether the plea or answer sufficiently sets forth such a defence is a question of Federal law, the determination of which cannot be controlled by the judgment of the state court;

(7) That when a question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered; and if the establishment of new lines of transportation should cause a diminution in the tolls collected, that is not, in itself, a sufficient reason why the corporation operating the road should be allowed to maintain rates that would be unjust to those who must or do use its property, but that the public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends;

(8) That the constitutional provision forbidding a denial of the equal protection of the laws, in its application to corporations operating public highways, does not require that all corporations exacting tolls should be placed upon the same footing as to rates; but that justice to the public and to stockholders may require in respect to one road rates different from those prescribed for other roads; and that rates on one road may be reasonable and just to all concerned, while the same rates would be exorbitant on another road.

THE case is stated in the opinion.

*Mr. W. H. Mackoy* and *Mr. James W. Bryan* for plaintiff in error.

*Mr. William Goebel* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The general assembly of Kentucky, by an act approved May 24, 1890, made it unlawful to demand, charge, collect or receive tolls in excess of the rates specified in that act for travel on that portion of the Covington and Lexington Turnpike Road which was then maintained.

The company announced its purpose to disregard the provisions of the act and to charge such tolls as were prescribed by the prior statutes. Thereupon the appellees living on or near the line of the turnpike road, and accustomed to travel on it daily with animals and vehicles, brought this suit for an injunction restraining the appellant from exacting tolls in excess of those fixed by the act of 1890.

A temporary injunction, in accordance with the prayer of the petition, was granted, and the company filed its answer. A demurrer to the answer was sustained. An amended answer was then tendered by the defendant, but the court would not allow it to be filed, and by final order made the injunction perpetual. That judgment was affirmed by the Court of Appeals of Kentucky. 20 S. W. Rep. 1031.

The principal questions are: 1. Whether the act of 1890 impairs the obligation of any contract that the turnpike company had with the State touching the matter of tolls. 2. Whether, independently of any question of contract, the act made such a reduction in tolls as to amount to a deprivation of the company's property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States. 3. Whether the act is repugnant to the clause of the Federal Constitution forbidding the denial by the State to any person within its jurisdiction of the equal protection of the law.

As these questions were properly raised by the pleadings, and were decided adversely to the company, the jurisdiction of this court to review the final judgment of the Court of Appeals of Kentucky cannot be doubted.

It is necessary to a clear understanding of the issues presented that reference be made to the enactments preceding the statute of 1890.

The Covington and Lexington Turnpike Road Company was incorporated by an act approved February 22, 1834, with authority to construct and permanently maintain a turnpike road from Covington, Kentucky, through Williamstown and Georgetown, to Lexington in that State.

By the nineteenth section of that act the company was

authorized to collect certain specified tolls. It is contended that the twenty-sixth section is a part of the defendant's contract with the State. That section provided : "That if at the expiration of five years after said road has been completed, it shall appear that the annual net dividends for the two years next preceding of said company, upon the capital stock expended on said road and its repairs, shall have exceeded the average of fourteen per cent per annum thereof, then and in that case, the legislature reserves to itself the right, upon the fact being made known, to reduce the rates of toll, so that it shall give that amount of net dividends per annum, and no more." Acts of Kentucky, 1833, pp. 537, 548.

By an act approved February 23, 1839, amendatory of the act of 1834 — the road then having been constructed from Covington to Williamstown — it was provided: " § 1. That the stockholders in the Covington and Lexington Turnpike Road Company, residing south of Williamstown, in Grant County, and anywhere between that place and Georgetown, may elect a separate board of directors, to consist of the same number, as authorized by the original charter; and the directors, chosen by them, shall have the control and shall superintend the construction of that part of the road to be located and constructed between Georgetown and Williamstown. § 2. That the stockholders in said road, residing north of Williamstown, shall have power, also, to elect a separate board of directors, for the purpose of controlling and superintending that portion of the road extending from Williamstown to Covington; and each board, so chosen, shall exercise separate control over its own portion of the road; but nothing herein shall be construed to divide and separate the stock in said road, but the same shall continue joint and common to all the stockholders, after the completion of said road." Acts of Kentucky, 1838–1839, p. 371. This amendment, it is admitted, was accepted by the turnpike company.

Subsequently, by the second section of an act approved March 22, 1851, it was provided:

" § 2. That so much of the second section of said act to amend the charter of the Lexington and Covington Turnpike

Road Company [meaning the act of 1839] as declares that the stock in said road shall continue joint and common to all the stockholders, after the completion of said road, is hereby repealed; and the stockholders whose stock is now under the control and management of the board of directors having control of the road north of Williamstown shall be and are hereby constituted a separate and independent company, under the name and style of the Covington and Lexington Turnpike Road Company, who shall be and forever remain separate and independent of that portion of said company owning the stock in the road now constructed south of Williamstown; and the stockholders whose stock is now under the control and management of the board of directors having the control and construction of the road south of Williamstown, shall be and are hereby constituted a separate and independent company, under the name and style of the Georgetown and Dry Ridge Turnpike Road Company, who shall be and forever remain separate and independent of that part of said company owning the stock in the road north of Williamstown; and that neither of said companies, thus formed, shall be held as in anywise responsible for the actings or doings of the other; but each shall have the exclusive ownership and control of that portion of road which they have respectively made, or, under the provisions of this act shall make, and shall have full power and authority to elect its own president and directors, to declare its own dividends, and pay the same to its own stockholders, *each company possessing and retaining all the powers, rights and capacities in severalty granted by the act of incorporation, and the amendments thereto, to the original company,* and subject to all the restrictions to which said company is subject, not inconsistent with the provisions of this act; and that neither company shall be in anywise liable for the debts or contracts of the other now in existence, or which may be hereafter made or contracted." Acts of Kentucky, 1850–1851, p. 479, v. 2.

It is claimed that the words in this section, " possessing and retaining all the powers, rights and capacities in severalty granted by the act of incorporation and the amendments

thereto, to the original company," embraced, or carried into the charters of the two corporations created by this act, the immunity or exemption, given by the twenty-sixth section of the above act of 1834, from legislation that would preclude the company from earning as much as fourteen per cent upon its capital stock.

The separate and independent company created by the last-named act as the Covington and Lexington Turnpike Road Company is the defendant in this suit. To it was committed the control of that portion of the road lying north of Williamstown. The act of 1851 further provided that it should be in force as soon as a majority of the stockholders of each company assented to its provisions. Such assent was duly given by the stockholders.

The next statute, in point of time, relating to the Covington and Lexington Turnpike Road Company was that of December 11, 1865, amending the charter of that company. That act provided that the company might charge tolls on their road as prescribed in that act, "instead of the rates now allowed by law." Private Acts of Kentucky, 1865, p. 2. The rates so prescribed were, it is alleged, different from and lower than those prescribed by the original charter of 1834.

The petition alleged that the defendant submitted to the regulation of its tolls, as indicated by the act of 1865, "and consented to and accepted said act, and has ever since acted thereunder and exacted the rates of toll therein specified." The answer, touching this point, avers: "It [the defendant] admits, also, the passage of the act by the general assembly of the Commonwealth of Kentucky mentioned in said petition as having been approved December 11, 1865, and entitled 'An act to amend the charter of the Covington and Lexington Turnpike Road Company,' which provided other and different rates of toll from those authorized to be collected by the act of February 22, 1834, above mentioned, which act of December 11, 1865, this defendant accepted and has acted under, but it denies that it submitted to the regulation of its tolls by the general assembly of the Commonwealth of Kentucky then or at any time, but says that it accepted said act and has acted

thereunder of its own volition, and that the acceptance of said act was voluntary on the part of said corporation, its stockholders and directors."

By the sixth section of an act of the general assembly of Kentucky, approved February 13, 1872, it was provided that the trustees of the Cincinnati Southern Railway, whose line extended across Kentucky, might "also, for the purpose of constructing and maintaining said line of railway, occupy or use any turnpike or plank road, street or other public way or ground, or any part thereof, upon such terms and conditions as may be agreed upon between said trustees and the municipal or other corporations, persons or public authorities owning or having charge thereof. . . . If no agreement can be made for the right to use or occupy any road, street or ground that may be necessary, the said trustees may take and appropriate said rights in the manner provided in the next section."

The trustees of the last-mentioned company gave the defendant notice that they required that portion of its turnpike road extending from the line between Scott and Grant counties to within about a mile of Walton, in Boone County, Kentucky, a distance of about thirty miles. Thereupon the defendant sold to the Cincinnati Southern Railway its road between Williamstown and Walton, in length twenty-two miles, for the consideration of $100,000, which sum was distributed among the stockholders of the turnpike company, each stockholder receiving $22 on each share of stock, which was in excess of its real or market value. Since the above sale the defendant has exercised and maintained control only over that portion of its road between Walton and Covington, a distance of eighteen miles.

Then came the act of May 24, 1890, to which reference has heretofore been made.

In our consideration of the questions presented by the record we lay aside the statute of Kentucky, passed February 14, 1856, providing that "all charters and grants of, or to corporations, or amendments thereof, and all other statutes, shall be subject to amendment or repeal at the will of the legisla-

ture, unless a contrary intent be therein plainly expressed: *Provided*, That whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested"; and which also provided that that act "shall only apply to charters and acts of incorporation to be granted hereafter." Acts of Kentucky, 1855, vol. 1, p. 15, c. 148. The provision in the General Statutes of Kentucky, which took effect on the 1st day of December, 1873, is that "all charters and grants of or to corporations or amendments thereof, enacted or granted since the 14th of February, 1856, and all other statutes, shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed: *Provided*, That, whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested." Gen. Stat. Kentucky, 1888, p. 861, c. 68, § 8. It is clear that the statute of 1856 had no application to charters and grants of or to corporations and amendments thereof, enacted or granted prior to February 14, 1856, but only to charters and acts of incorporation granted after that date. It, therefore, has no application to the act of 1851, granting to the Covington and Lexington Turnpike Company "the powers, rights and capacities" given by the act of 1834. Nor is there any ground for holding that the turnpike company was brought by the act of 1865 under the operation of the general statute reserving to the legislature the right to amend or repeal charters of or grants to corporations. That act did nothing more than reduce the rates of toll to be charged. It did not create a new corporation, nor give any additional franchises or privileges to the company. The mere collecting of tolls, in conformity with such rates, does not show that the company assented to the exercise by the legislature, at will, of the power to amend or repeal its charter. Whatever authority, therefore, the general assembly had, by statute, to regulate the tolls of the plaintiff in error arose from its general power to regulate the affairs of a corporation which came into existence by its authority, and which owned and controlled a highway established for public

use. *Ruggles* v. *Illinois,* 108 U. S. 526, 531; *Railroad Commission cases,* 116 U. S. 307, 325; *Dow* v. *Beidelman,* 125 U. S. 680, 688; *Covington & Cincinnati Bridge Co.* v. *Kentucky,* 154 U. S. 204, 215.

Was the Covington and Lexington Turnpike Road Company entitled, under its charter, to be exempt from legislation that would prevent it from earning at least fourteen per cent "upon the capital stock expended upon said road and its repairs," as prescribed in the act of 1834?

The act of 1834 having given to the original corporation an exemption or immunity from legislation that would prevent it from earning as much as fourteen per cent upon the capital stock expended upon its road and for repairs, the contention of the defendant is that this exemption or immunity passed to the two corporations created by the act of 1851, and which, by the terms of that act, succeeded "to all the powers, rights and capacities" granted by the act of 1834 to the original corporation. This view was properly rejected by the Court of Appeals of Kentucky. It was well said by Judge Pryor, speaking for that court, that "the liability and duties owing the State and the public by the one corporation had been severed by the act of 1839, and by the act of 1851 two new corporations were created, with the rights and powers of the one entirely distinct from the other, and no means of ascertaining what per cent the old corporation would have made upon its stock. In fact, the old corporation was extinct, and to hold that the new corporations were exempt from legislative interference would be to restrain the exercise of legislative power by implication, when a reasonable construction of the new grants must lead to a different conclusion."

These principles are in entire accord with the settled doctrines of this court. When a corporation succeeds to the rights, powers and capacities of another corporation, it does not thereby or necessarily become entitled to an exemption from taxation. An exemption or immunity from taxation so vitally affects the exercise of powers essential to the proper conduct of public affairs and to the support of government, that immunity or exemption from taxation is never sustained

unless it has been given in language clearly and unmistakably evincing a purpose to grant such immunity or exemption. All doubts upon the question must be resolved in favor of the public. There are positive rights and privileges, this court said in *Morgan* v. *Louisiana*, 93 U. S. 217, without which the road of a corporation could not be successfully worked, but immunity from taxation is not one of them. In a recent case, *Norfolk & Western Railroad* v. *Pendleton*, 156 U. S. 667, 673, we had occasion to say, in harmony with repeated decisions, that, "in the absence of express statutory direction, or of an equivalent implication by necessary construction, provisions, in restriction of the right of the State to tax the property or to regulate the affairs of its corporations, do not pass to new corporations succeeding, by consolidation or by purchase under foreclosure, to the property and ordinary franchises of the first grantee"; and that this was a "salutary rule of interpretation, founded upon an obvious public policy, which regards such exemptions as in derogation of the sovereign authority and of common right, and therefore not to be extended beyond the exact and express requirements of the grant construed *strictissimi juris*. *Morgan* v. *Louisiana*, 93 U. S. 217; *Wilson* v. *Gaines*, 103 U. S. 417; *Chesapeake & Ohio Railway* v. *Miller*, 114 U. S. 176."

The same principles should be recognized when the claim is of immunity or exemption from legislative control of tolls to be exacted by a corporation established by authority of law for the construction of a public highway. It is of the highest importance that such control should remain with the State, and it should never be implied that the legislative department intended to surrender it. Such an intention should not be imputed to the legislature if it be possible to avoid doing so by any reasonable interpretation of its statutes. It is as vital that the State should retain its control of tolls upon public highways as it is that it should not surrender or fetter its power of taxation. We admit there is some ground for the contention that, by the grant in the act of 1851 to each of the two corporations named in it, of "the powers, rights and capacities" granted to the corporation of 1834, the legislature

intended to exempt the new corporations, as it did the original one, from all legislation that would prevent them from earning as much as fourteen per cent on the capital stock expended on their respective roads and for repairs. But as the act of 1851 may not unreasonably be interpreted as intended only to pass to the new corporations such powers, rights and capacities as were necessary to the successful working of the respective roads, and not an exemption from legitimate and ordinary legislative control of their affairs and business, it must, in the interest of the public, be so interpreted. It is settled law that in grants by the public nothing passes merely by implication; and if a contract with a State, relating to the exercise of franchises, is susceptible of two meanings, "the one restricting and the other extending the powers of a corporation, that construction is to be adopted which works the least harm to the State." *The Binghampton Bridges*, 3 Wall. 51, 75; *Ruggles* v. *Illinois*, 108 U. S. 526; *Stein* v. *Bienville Water Supply Co.*, 141 U. S. 67, 80, 81.

The views we have expressed find some support in the fact that, by the act of 1865, the legislature prescribed rates of toll for the turnpike company, without any reference to the twenty-sixth section of the act of 1834, and the provisions of that statute were accepted, and have ever since been acted upon by that company. So far as the record shows, that acceptance was unconditional, and without any reservation of a right by the company, under the previous law, to earn as much as fourteen per cent on its capital stock. Touching this part of the case, the Court of Appeals of Kentucky said: "Nor ought this court, in the absence of express enactment, after the lapse of more than half a century, with legislation not only severing the old corporation, but regulating the rate of toll on these roads, to hold that this immunity from legislative interference was a perpetual right in the nature of a contract that could not be disturbed. The stockholders have consented and asked an entire change of the original grant, and submitted to legislation regulating their tolls, evidencing that with their own contention the immunities in the act of

1834 were not regarded as forming a part of the corporate grants subsequently made."

For the reasons stated, we are of opinion that when the act of 1890 was passed, the power of the general assembly over the subject of tolls to be exacted by the plaintiff in error was not impaired or restrained by any contract with the State in reference to the amount which the company might earn from the use of its road.

It is, however, contended that the act of 1890, by its necessary operation, deprives the company of its property without due process of law, in that if tolls cannot be charged in excess of those prescribed by that act, the company cannot possibly maintain its road or derive any profit whatever for stockholders. This is a more serious question than the one we have just examined, and is not so easy of solution.

In its original answer, filed in 1890, and to which a demurrer was sustained, the turnpike company referred to the section of the act of 1834 reserving to the legislature the right, in a certain contingency, to reduce rates of toll, and alleged that, "at the expiration of five years after said road had been completed the annual net dividends for the two years next preceding of said defendant company upon the capital stock expended upon said road and its repairs had not exceeded and did not exceed the average of fourteen per centum per annum thereof, and that since the completion of this defendant's road the annual net dividends of the defendant company upon the capital stock expended upon said road and its repairs have not averaged to exceed fourteen per centum per annum, but, upon the contrary, have averaged very much less, and for a number of years last past the average annual net dividends of said company have not exceeded four per centum upon the capital stock of said company."

The company further alleged that "its receipts from tolls for a number of years last past under the rate of tolls prescribed by the act of December 11, 1865, mentioned in the petition, have averaged only about $16,000 per annum, and that the ordinary annual expenses of operating and maintaining its road during the same time have averaged about $8000

per annum; that during this and the coming year it will be necessary for it to incur certain extraordinary expenses in the purchase of ground for and building a new toll house for the second toll gate from Covington on its road and in the purchase or condemnation of ground for straightening its road and laying out a side road along that portion of its road between that part of the city of Covington known as Lewisburg and the first toll gate on its said turnpike road, which extraordinary expenses will amount to about $4000; that the act of May 24, 1890, attempts to reduce the tolls on this defendant's road about fifty per cent, and that if the same were adopted the income of the company from tolls would not be more than $8000 per annum, nor more than sufficient to enable defendant to meet the ordinary expenses of its road, and would leave nothing with which to meet said extraordinary expenses, and there would be no income out of which dividends could be paid to stockholders upon the money which they had invested in the stock of said road. This defendant also says that within the last few years the Louisville and Nashville Railroad, which has a station on the line of this company's turnpike, and the Cincinnati Southern Railway, which has several stations on the line of this defendant's turnpike, have diverted a large amount of travel from said turnpike and have diminished this company's earning capacity very largely, and that other railroads and electric roads touching defendant's road and having stations thereon have been chartered and are in contemplation, the effect and construction of which will be to still further impair the earning capacity of this defendant and to diminish the dividends of this defendant under the rate of tolls in force by an act of December 11, 1865.

"This defendant further says that the grade of the first two and a half miles of its road leading out of the city of Covington is very steep; that for a portion of said two and a half miles its road is built along the side of a hill; that the entire said two and a half miles is expensive to maintain, especially that portion along the side of the hill, the portion of the road towards the slope of the hill having frequently given away

and slipped and entailed great expense upon the defendant in the repair of the same, and that from the nature of the soil over and along which said portion of said road is built said process of sliding and giving away is liable to continue in the future and to entail still further expense upon the defendant. It says that the adoption of the rate of tolls fixed by the act of May 24, 1890, would disable and prevent this defendant from performing the duties that it owes to the public and would prevent it from ever hereafter paying any dividends to its stockholders, and that the rate of tolls prescribed in said act of May 24, 1890, is unreasonable and unjust to defendant and its stockholders, and that to permit the same to be enforced would be to destroy entirely the value of the property of the defendant and the value of the shares of capital stock of the defendant held by its stockholders and destroy entirely the dividend earning capacity of this defendant, and that to permit said act of May 24, 1890, to be enforced would be to exercise absolute arbitrary power over the property of the defendant and its stockholders, in violation of section 2 of the bill of rights of the constitution of Kentucky, and would be depriving the defendant and its stockholders of their property without due process of law and the taking of the same for public use without the consent of the defendant and its stockholders and without just compensation being previously made to them, and that to permit the enforcement of said act of May 24, 1890, is to violate article 5 of the amendments to the Constitution of the United States and sections 3, 12, 14 and 15 of the bill of rights of the Constitution of the United States and the amendments thereto and to the constitution of the State of Kentucky."

It was also alleged in the original answer that, under the act of 1890, sufficient income could not be earned "to maintain the road and provide for its ordinary expenses, without taking into consideration any extraordinary expenses."

We have then the case of a corporation invested by its charter with authority to construct and maintain a turnpike road, and to collect tolls "agreeable" to certain named rates, and which is required by a subsequent legislative enactment

to conform to a tariff of rates that is unjust and unreasonable, and prevents it, out of its receipts, from maintaining its road in proper condition for public use, or from earning any dividends whatever for stockholders. These facts are admitted by the demurrer. Is such legislation forbidden by the clause of the Constitution of the United States declaring that no State shall deprive any person of property without due process of law? We are of opinion that, taking, as we must do, the allegations of the answer to be true, this question must be answered in the affirmative.

It is now settled that corporations are persons within the meaning of the constitutional provisions forbidding the deprivation of property without due process of law, as well as a denial of the equal protection of the laws. *Santa Clara County* v. *Southern Pacific Railway Co.*, 118 U. S. 394; *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181, 189; *Minneapolis & St. Louis Railway* v. *Beckwith*, 129 U. S. 26; *Charlotte &c. Railroad* v. *Gibbes*, 142 U. S. 386, 391. And, as declared in *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649, 657, upon the authority of previous decisions, "there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of the property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the Constitution of the United States, as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws" — citing *Railroad Commission cases*, 116 U. S. 307, 331; *Dow* v. *Beidelman*, 125 U. S. 681; *Chicago, Milwaukee &c. Railway* v. *Minnesota*, 134 U. S. 418; *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362.

In the *Railroad Commission cases*, the court, speaking by Chief Justice Waite, recognized it as settled that "a State has power to limit the amount of charges by railroad companies for the transportation of persons and property within its own

jurisdiction, unless restrained by some contract in the charter, or unless what is done amounts to a regulation of foreign or interstate commerce." But it took care also to announce that " it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy ; and limitation is not the equivalent of confiscation. Under the pretence of regulating fares and freights, the State cannot require a railroad to carry persons and property without reward ; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

So, in *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 397, 399, 410, 412, in which previous decisions were referred to, the court said that beyond doubt it was within the power and duty of the courts " to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and if so found to be, to restrain its operation." Again : " These cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body or the public as a whole) operates to divest the other of any rights of person or property. In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the

public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held. . . . If the State were to seek to acquire the title to these roads, under its power of eminent domain, is there any doubt that constitutional provisions would require the payment to the corporation of just compensation, that compensation being the value of the property as it stood in the markets of the world, and not as prescribed by an act of the legislature? Is it any less a departure from the obligations of justice to seek to take not the title but the use for the public benefit at less than its market value? . . . It is unnecessary to decide, and we do not wish to be understood as laying down, as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others."

The cases to which we have referred related to the power of the legislature over rates to be collected by railroad corporations. But the principles announced in them are equally applicable, in like circumstances, to corporations engaged under legislative authority in maintaining turnpike roads for the use of which tolls are exacted. Turnpike roads established by a corporation, under authority of law, are public highways, and the right to exact tolls from those using them comes from the State creating the corporation. *California* v. *Central Pacific Railroad*, 127 U. S. 1, 40. And the exercise of that right may be controlled by legislative authority to the same extent that similar rights, connected with the construction and management of railroads by corporations, may be controlled. A statute which, by its necessary operation, com-

pels a turnpike company, when charging only such tolls as are just to the public, to submit to such further reduction of rates as will prevent it from keeping its road in proper repair and from earning any dividends whatever for stockholders, is as obnoxious to the Constitution of the United States as would be a similar statute relating to the business of a railroad corporation having authority, under its charter, to collect and receive tolls for passengers and freight.

It is suggested by counsel for the plaintiffs that neither the original nor the amended answer sufficiently disclosed the facts upon which the company rested its contention as to the invalidity of the act of 1890, and that, upon the showing made by the company, the court, under the established rule forbidding the annulment of a legislative enactment not clearly and palpably unconstitutional, was not obliged to hold that act to be repugnant to the Constitution of the United States. We do not concur in this view. The answer disclosed what had been the average annual receipts of the company under the act of 1865 for a number of years immediately preceding the passage of the act of 1890, and what during that period had been the average annual expenses; alleged that the receipts for the several preceding years had not admitted of dividends greater than four per centum on the par value of the company's stock; that the act of 1890 reduced the tolls 50 per cent below those allowed by the act of 1865; and that such reduction would so diminish the income of the company that it could not maintain its road, meet its ordinary expenses and earn any dividends whatever for stockholders. These allegations were sufficiently full as to the facts necessary to be pleaded, and fairly raised for judicial determination the question — assuming the facts stated to be true — whether the act of 1890 was in derogation of the company's constitutional rights. It made a *prima facie* case of the invalidity of that statute. When a party specially sets up and claims a right or privilege under the Constitution or laws of the United States, the question of the sufficiency of allegations to present that issue is not concluded by the view expressed by the state court. In *Mitchell* v. *Clark*, 110 U. S. 633, 645, this court

said : "The question whether a plea sets up a sufficient defence, when the defence relied on arises under an act of Congress, does present, and that necessarily, a question of Federal law; for the question is and must be, does the plea state facts which under the act of Congress constitute a good defence." This principle was approved in *Boyd* v. *Thayer*, 143 U. S. 135, 180. We decide, however, nothing more on this hearing than that upon the facts alleged the demurrer to the answer should have been overruled; and upon the completion of the pleadings — unless the plaintiffs elected to stand by their demurrer — the parties should be allowed to make their proofs touching the issues involved.

It is proper to say that if the answer had not alleged, in substance, that the tolls prescribed by the act of 1890 were wholly inadequate for keeping the road in proper repair and for earning dividends, we could not say that the act was unconstitutional merely because the company (as was alleged and as the demurrer admitted) could not earn more than four per cent on its capital stock. It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. If the establishing of new lines of transportation should cause a diminution in the number of those who need to use a turnpike road, and, consequently, a diminution in the tolls collected, that is not, in itself, a sufficient reason why the corporation, operating the road, should be allowed to maintain rates that would be unjust to those who must or do use its property. The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends. The legislature

has the authority, in every case, where its power has not been restrained by contract, to proceed upon the ground that the public may not rightfully be required to submit to unreasonable exactions for the use of a public highway established and maintained under legislative authority. If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens upon the public. So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the service rendered by the company are reasonable, is an element in the general inquiry whether the rates established by law are unjust and unreasonable. That inquiry also involves other considerations, such, for instance, as the reasonable cost of maintaining the road in good condition for public use, and the amount that may have been really and necessarily invested in the enterprise. In short, each case must depend upon its special facts; and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature for a corporation controlling a public highway are, as an entirety, so unjust as to destroy the value of its property for all the purposes for which it was acquired, its duty is to take into consideration the interests both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered in determining whether the legislature has, under the guise of regulating rates, exceeded its constitutional authority, and practically deprived the owner of property without due process of law. What those other circumstances may be, it is not necessary now to decide. That can be best done after the parties have made their proofs.

It is further insisted by the company that the rates prescribed for it by the act of 1890 are much less than those imposed by the General Statutes of Kentucky upon other turnpike companies of the State; consequently, that that act denies to it the equal protection of the laws. The proposition of the defendant is, that the constitutional provision referred

to requires all turnpike companies in the State to be placed by the legislature, when exercising its general power over the subject of rates to be charged upon highways of that character, upon substantially the same footing.   Upon this point the Court of Appeals of Kentucky said: "A turnpike road leading into and connected with a populous city like that of the city of Covington could afford to charge less toll by reason of the immense travel upon it than turnpikes in thinly settled portions of the county or State, and hence under former constitutions the legislature has seen proper to regulate the tolls as the turnpike road may happen to be located." The circumstances of each turnpike company must determine the rates of toll to be properly allowed for its use.   Justice to the public and to stockholders may require, in respect of one road, rates different from those prescribed for other roads. Rates on one road may be reasonable and just to all concerned, while the same rates would be exorbitant on another road. The utmost that any corporation, operating a public highway, can rightfully demand at the hands of the legislature when exerting its general powers is that it receive what, under all the circumstances, is such compensation for the use of its property as will be just both to it and to the public.   If the rates prescribed for the defendant in this case were manifestly much lower—taking them as a whole — than the legislature has, by general law, prescribed for other corporations whose circumstances and location are not unlike those of the defendant, a different question would be presented.   At any rate, no case of that kind is properly presented by the pleadings, and there is no ground for holding that the act of 1890 denies to the defendant the equal protection of the laws.

. For the reasons we have given,

*The judgment of the court below is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.*