## BEATRICE CREAMERY CO. v. CLINE, Dist. Atty. for City and County of Denver, Colo.

## FRINK DAIRY CO. et al. v. SAME.

(District Court, D. Colorado. November 14, 1925.)

Nos. 7986, 7990.

1. **Constitutional law** ⟨⬦⟩210, 252—**Corporations protected by due process and equal protection clause.**

Corporations are within the protection of the Fourteenth Amendment, prohibiting the denial of equal protection of laws and taking of property without due process.

2. **Agriculture** ⟨⬦⟩1—**Constitutional law** ⟨⬦⟩240 (1), 296(1)—**Colorado Anti-Trust Act held unconstitutional, co-operative agricultural societies being exempted from its application.**

Colorado Anti-Trust Act, prohibiting all combinations to fix prices of commodities or to

otherwise restrict trade or commerce, *held* violative of the due process and equal protection clause of Const. U. S., Amend. 14, in view of Colorado Co-operative Marketing Act, exempting nonprofit agricultural associations, marketing agricultural products, from its application.

**3. Injunction ☞105(1)—Court of equity will not ordinarily restrict criminal prosecution.**

A court of equity has no jurisdiction over prosecution and punishment of crime, and ordinarily will not sustain a bill to restrain or relieve against proceedings of that kind.

**4. Injunction ☞105(1)—Criminal proceedings invasive of property rights properly restrained.**

Writ of injunction will issue to restrain the invasion of the rights of property by the enforcement of an unconstitutional law, even if effect of such writ is to restrain institution or continuation of criminal prosecution.

**5. Injunction ☞105(1)—Continuance of criminal prosecutions restrained notwithstanding commenced before injunction suit.**

Where continuance of prosecution under unconstitutionaal Colorado Anti-Trust Act would invade and perhaps destroy property rights of complainants, as shown by pleadings and affidavits, injunction will be granted to restrain prosecutions, notwithstanding they were pending before suit in federal court was instituted.

Symes, District Judge, dissenting in part.

In Equity. Separate actions by the Beatrice Creamery Company, a Delaware corporation, and by the Frink Dairy Company, a corporation, and others, against Foster Cline, as District Attorney for the City and County of Denver, State of Colorado, to enjoin enforcement of the Colorado Anti-Trust Act. Decree for complainants.

A. J. Fowler, E. B. Fowler, Thomas Ward, Jr., Wilbur F. Denious and Hudson Moore, all of Denver, Colo., R. D. Hawley, of Ft. Collins, Colo., and Simon J. Heller, of Denver, Colo., for plaintiffs.

Foster Cline, A. L. Betke, Paul M. Segal, and Harold Clark Thompson, all of Denver, Colo., for defendant.

Wm. L. Boatright, Atty. Gen., and Charles Roach and Jean S. Breitenstein, Asst. Attys. Gen., for state of Colorado.

Before LEWIS, Circuit Judge, and KENNEDY and SYMES, District Judges.

LEWIS, Circuit Judge. [1]] These are suits to enjoin the enforcement of an Act of the Colorado General Assembly approved April 7, 1913, Session Laws 1913, p. 613, commonly known as the Colorado Anti-Trust Act, on the alleged ground that it is in conflict with the Fourteenth Amendment to the Constitution of the United States, in deny-

9 F.(2d)—12

ing to plaintiffs equal protection of the laws and, if enforced, will deprive plaintiffs of their property without due process. A corporation is within the protection of those clauses of the amendment. Covington & L. Co. v. Sandford, 164 U. S. 578, 17 S. Ct. 198, 41 L. Ed. 560. The Beatrice Creamery Company is alleged to be a corporate citizen and resident of the State of Delaware. The three corporations in the other case were organized under the laws of Colorado, and the four individual plaintiffs in that case are stockholders, directors and officers of one or of the other of the four corporations named, and are respectively in charge of the management of said corporations, all of which are engaged in the purchase, sale and distribution of milk and dairy products at Denver and other places in Colorado. They each have large investments in property in Denver, one at Pueblo also, necessary for the transaction of their business in supplying their customers with milk and milk products. The defendant Cline is the District Attorney for the Second Judicial District of the State, and it is made his duty to institute and prosecute criminal cases for offenses against the laws of the State within that District.

After stating the jurisdictional amount of the matter in controversy and that the suits arise under the Constitution of the United States, it is alleged in each complaint that defendant, acting under the provisions and requirements of said Anti-Trust Act, filed an Information in the criminal division of said District Court, in which plaintiffs are charged with a conspiracy to violate said Anti-Trust Act, that plaintiffs were arraigned, pleaded not guilty, and the case has been set down for trial. A copy of the Information, attached to an affidavit in support of the bill, has been exhibited. It charges the four corporations and the four individuals who appear here as plaintiffs with the same conspiracy in five different counts, to unlawfully fix and control the price of milk and milk products, each count stating the charge in different form, to comply with the varying terms of the definitions given by the Act of an unlawful conspiracy. The Information was filed on August 22, 1925, and these bills were brought, one on October 27 and one on October 29, 1925. The Act, in its definition of unlawful trusts and combinations, is in the usual terms of such legislation. It prohibits and makes unlawful a combination of two or more persons or corporations for the purpose of creating or carrying out any restrictions in trade or commerce, the prevention of competition in the

manufacture, making, transportation, sale or purchase of merchandise, produce or other commodities the fixing of any standard of figures whereby the price to the public of any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this State shall, in any manner, be controlled or established, the making or entering into any contract or agreement of any kind, by which the parties shall bind themselves not to sell, manufacture, dispose of or transport any article or commodity below a common standard figure, or to keep the price of such article, commodity or transportation at a fixed or graded figure, or by which they shall in any manner establish or settle the price of any article or commodity or of transportation between themselves or between themselves and others, so as to preclude a free and unrestricted competition, or by which they shall agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity so that its price may be in any manner affected. Following the definitions of the unlawful trusts and combinations which the Act prohibits it continues:

"And all such combinations are hereby declared to be against public policy, unlawful and void; provided that no agreement or association shall be deemed to be unlawful or within the provisions of this act, the object and purposes of which are to conduct operations at a reasonable profit or to market at a reasonable profit those products which cannot otherwise be so marketed; provided further that it shall not be deemed to be unlawful, or within the provisions of this act, for persons, firms, or corporations engaged in the business of selling or manufacturing commodities of a similar or like character to employ, form, organize or own any interest in any association, firm or corporation having as its object or purpose the transportation, marketing or delivering of such commodities; and provided further that labor, whether skilled or unskilled, is not a commodity within the meaning of this act."

The Act makes it the duty of the Attorney General of the State and of the District Attorney of any district in which a violation of any of the provisions of the Act by a corporation or any of its officers or agents occurs, to institute an action in any court of the State having jurisdiction, for the forfeiture of the charter, rights and franchise of such corporation and its dissolution. A violation of the Act prohibits the corporation from doing any further business in the State and subjects the corporation, its officers and agents to prosecution as for a misdemeanor, and on conviction to fine and imprisonment. It provides that any contract or agreement in violation of any of the provisions of the Act shall be absolutely void and not enforcible in any of the courts of the State, and that when any civil action shall be commenced in any court of the State it shall be lawful to plead in defense thereof that the cause of action sued upon grew out of a contract or agreement in violation of the Act.

The complaints allege that the defendant threatens to file other criminal informations charging plaintiffs with other violations of the Act, and to institute proceedings to forfeit the charters of the corporate plaintiffs and to oust them from transacting any further business in the State, and if not restrained he will proceed to do so. They charge that the institution and pendency of the Information in the State court, the publicity that has been given to it and the avowed purpose of the defendant to institute other proceedings, civil and criminal, against plaintiffs have been a constant threat and menace to the business of the plaintiffs, that plaintiffs' good-will and business, which they had built up through many years of labor and effort, have been and will continue to be seriously injured and irreparably damaged because thereof and because of the publicity which has been and will continue to be attendant upon such activities of the defendant. Affidavits in support of the bills show that plaintiffs have already suffered damages in large amounts from loss of business due to the defendant's filing the Information and his threats to institute other civil and criminal proceedings under the Act, and that the individual plaintiffs have suffered and will continue to suffer financial loss through depreciation of their stock holdings in the corporations, each in excess of three thousand dollars.

The main point of contention is over the question of the validity of the State Anti-Trust Act. If that Act is not in conflict with the Fourteenth Amendment the plaintiffs have no case. The first proviso in the paragraph above quoted from the Act is relied on by plaintiffs' counsel as rendering the whole Act void because of the rule announced by the Supreme Court in United States v. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, International Harvester Co. v. Kentucky, 234 U. S. 216, 34 S. Ct. 853, 58 L. Ed. 1284; and other like cases; it being argued that the only combinations denounced by the Act are

those which may be formed for the purpose of conducting business at an unreasonable profit, and that the Act affords no measure by which it can be determined what profits are reasonable and what are not reasonable. We are not willing to now so construe either of the provisos quoted. The whole Act and all kinds of prosecutions under it, civil and criminal, are challenged. It defines and prohibits combinations which may operate as restrictions on trade, which in no way deal with the subject of prices of commodities or the profits to be realized on the sale thereof. It was so construed by the Colorado Supreme Court in Campbell v. People, 72 Colo. 213, 210 P. 841. In that case the conviction was on a charge that the unlawful agreement between the defendants, who constituted an association of master plumbers, was that none but members in good standing of a named local union could be employed by the defendants. The court said:

"We do not agree that the sole purpose of the Act was to prevent the restriction of dealing in commodities but think that it was also to prevent the restriction of competition and the attainment of the control of a business; i. e., monopoly."

Many well known methods can be resorted to by those in combination to restrict or destroy competition and affect prices and profits by indirection,—the division of territory between them, and other well known methods. Neither in the Campbell Case nor in Johnson v. People, 72 Colo. 218, 210 P. 843, and People v. Apostolos, 73 Colo. 71, 213 P. 331, in all of which convictions under the Anti-Trust Act were sustained, did the Supreme Court consider the constitutionality of the Act. The two last cases referred to dealt with combinations to increase prices. But we take these rulings of the Supreme Court as an implied conclusion on its part that the Act was valid as the law of the State then stood. The last of those opinions was rendered on March 5, 1923.

We come now to consider another ground on which the Act is said to be invaild. On March 30, 1923, what is known as "the Co-operative Marketing Act" was passed by the Colorado General Assembly and approved by the Governor with an emergency clause. Session Laws 1923, p. 420. It provides that eleven or more persons, a majority of whom are residents of this State, engaged in the production of agricultural products, may form a non-profit co-operative association, with or without capital stock. It defines the term "agricultural products" as including horticultural, viticultural, forestry, dairy,

live stock, poultry, bee and any farm products; that the powers of such association shall be to engage in any activity connected with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling or utilization of any agricultural products brought or delivered to it by its members, or the manufacturing or marketing of the by-products thereof, or in any activity connected with the purchase, hiring or use by its members of supplies, machinery or equipment, or in the financing of any such activities, and it may in its articles assume the right to handle the products of non-members, but, in such event, the association shall not handle for non-members a volume of products greater in the aggregate than the aggregate of products handled by it for its own members; such associations are given the right to act as agents of its members in any of said activities; to do everything conducive to or expedient for the interests or benefit of the association and to contract accordingly; to admit as members only those engaged in the production of agricultural products to be handled by or through the association; to issue certificates of membership to its members; to make marketing contracts between the association and its members requiring the members to sell, for any period of time not over ten years, all or any specified part of their agricultural products or commodities exclusively to or through the association, or any facilities to be created by the association; to make by-laws fixing a specific sum as liquidated damages to be paid by a member to the association upon breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products; it provides that any two or more associations may unite in using, or may separately use the same persons, methods, means and agencies for carrying on and conducting their business; and then, actuated by knowledge of the real character of the organizations which the Act authorizes, its sections 22 and 29 read thus:

(22) "Any provisions of law which are in conflict with this Act shall be construed as not applying to the associations herein provided for."

(29) "No association organized hereunder and complying with the terms hereof shall be deemed to be a conspiracy or a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition or to fix prices arbitrarily nor shall the marketing contracts and agreements between the association and its members or any agree-

ments authorized in this Act be considered illegal as such or in unlawful restraint of trade or as part of a conspiracy or combination to accomplish an improper or illegal purpose."

[2] Nothing can be plainer than that these combinations authorized through the formation of the associations as provided for in the Act would, in fact, be combinations in restraint of trade and an attempt to lessen competition in the marketing of agricultural products. A declaration that they should not be so considered is as futile as a statement that white is black. Of course, we do not pretend to say that the legislature did not have the power to exempt such combinations from prosecution and dissolution as unlawful common-law or statutory trusts. That was entirely a matter for its consideration. In a decision by the State Supreme Court (Rifle Potato Growers' Co-operative Assn. v. Smith, 240 P. 937) rendered on October 19, 1925, and not yet [officially] reported, this Act was sustained. That court, in answering the contention that such an association was in restraint of trade and void under the Colorado Anti-Trust Law said:

"It is objected that the contract is in restraint of trade and so void under the Colorado Anti-Trust Law (C. L. 1921, §§ 4036– [4044] 4043), but the Act of 1923, being the later Act, controls the earlier."

There can be no doubt that the later Act exempted the associations which it authorized from the penalties and restrictions of the earlier Act. The Supreme Court of the United States, in Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679, had under consideration an Act of the legislature of the State of Illinois (Laws 1893, p. 182) defining unlawful combinations, very much in the same terms as the Colorado Act of 1913, the ninth section of which reads thus:

"The provisions of this Act shall not apply to agricultural products or live stock while in the hands of the producer or raiser;" and the question there, as here, was whether the Sewer Pipe Company, in disposing of its products while a member of a prohibited combination, was under the Act denied equal protection of the laws. In disposing of the question that court said:

"A state may in its wisdom classify property for purposes of taxation, and the exercise of its discretion is not to be questioned in a court of the United States, so long as the classification does not invade rights secured by the Constitution of the United States. But different considerations control when the State, by legislation, seeks to regulate the enjoyment of rights and the pursuit of callings connected with domestic trade. In prescribing regulations for the conduct of trade, it cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of government, and at the same time, indirectly, to build up or protect particular interests or industries. It is quite a different thing for the State, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce. Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates. * * *

"Returning to the particular case before us, and repeating or summarizing some thoughts already expressed, it may be observed that if combinations of capital, skill or acts, in respect of the sale or purchase of goods, merchandise or commodities, whereby such combinations may, for their benefit exclusively, control or establish prices, are hurtful to the public interests and should be suppressed, it is impossible to perceive why like combinations in respect of agricultural products and live stock are not also hurtful. Two or more engaged in selling dry goods, or groceries, or meats, or fuel, or clothing, or medicines, are, under the statute, criminals, and subject to a fine, if they combine their capital, skill or acts for the purpose of establishing, controlling, increasing or reducing prices, or of preventing free and unrestrained competition amongst themselves or others in the sale of their goods or merchandise; but their neighbors, who happen to be agriculturalists and live stock raisers, may make combinations of that character in reference to their grain or live stock without incurring the prescribed penalty. Under what rule of permissible classification can such legislation be sustained as consistent with the equal protection of the laws? * * * We conclude this part of the discussion by saying that to declare that some of the class engaged in domestic trade or commerce shall be deemed criminals if they

violate the regulations prescribed by the State for the purpose of protecting the public against illegal combinations formed to destroy competition and to control prices, and that others of the same class shall not be bound to regard those regulations, but may combine their capital, skill or acts to destroy competition and to control prices for their special benefit, is so manifestly a denial of the equal protection of the laws that further or extended argument to establish that position would seem to be unnecessary."

We reach a like conclusion as to the Colorado Anti-Trust Act.

[3-5] The District Attorney, and the Attorney General of the State, who also made argument and submitted brief, do not deny that it is the duty of the court, on the facts stated, to grant the writ enjoining the institution of further court proceedings, civil and criminal, if we hold the Anti-Trust Act to be unconstitutional; but it is earnestly and ably argued by the District Attorney that the court is without right to direct the issuance of its writ against him staying further prosecution of plaintiffs on the Information that had been filed prior to the institution of these suits. On consideration of the contention of the District Attorney we think a fact not heretofore stated is of great importance. It is this: The pleadings here and affidavits in support disclose that the State District Judge overruled motions to quash the Information, declined to hear further argument from defendants' counsel in that case on the unconstitutionality of the State Anti-Trust Act, and has set that case down for trial at an early date. Under the State practice defendants in a criminal case cannot be heard in the State Supreme Court until after conviction, and the removal of their case to that court after the happening of that event, and putting it in condition to be finally heard there, requires time, frequently extended by unexpected delays. We are further informed by the proof that the record in that case will necessarily be voluminous. The four corporate defendants are jointly charged; their books and records will become competent proof in arriving at the question as to what are reasonable prices and profits for their products, which will involve a full investigation of the business of each company and require expert testimony. Such a record cannot be put in shape for the appellate court until after the lapse of many months. In the meantime the Act prohibits them from transacting any business in the State of Colorado. A verdict of guilty will be conclusive proof that they have vio-

lated the State Anti-Trust Act. It will also be conclusive proof in a suit to forfeit their rights and franchises and dissolve them, and a good defense in actions they may bring against their debtors. Under the charges made in the bills it therefore seems clear that further prosecution of the pending Information is but a step in the invasion of their property rights, and if continued those rights will be wholly destroyed under an invalid law. It is a general principle well understood that a court of equity has no jurisdiction over the prosecution and punishment of crimes, and ordinarily will not sustain a bill to restrain or relieve against proceedings of that kind. In re Sawyer, 124 U. S. 200, 8 S. Ct. 482, 31 L. Ed. 402; Harkrader v. Wadley, 172 U. S. 148, 19 S. Ct. 119, 43 L. Ed. 399; Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. There are, however, well established exceptions to this rule. The writ will be granted to stay the institution of criminal proceedings by a party to the cause, that would put in issue the same right which is in issue in the pending cause; the writ will also issue to prohibit the invasion of the rights of property by the enforcement of an unconstitutional law. It is the latter exception with which we are now concerned. We think there will be invasion of property rights, even destruction of them, if the pending prosecution is permitted to continue under this unconstitutional statute; and in that condition of the case there can be no difference in principle whether the criminal proceedings are instituted before or after the bill was filed. We think the Supreme Court has so ruled in Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 23 S. Ct. 498, 47 L. Ed. 778. There the criminal prosecution was started first, and in answer to the argument based on that fact it was said:

"It would seem that, if there were jurisdiction in a court of equity to enjoin the invasion of property rights through the instrumentality of an unconstitutional law, that jurisdiction would not be ousted by the fact that the State had chosen to assert its power to enforce such law by indictment or other criminal proceeding. Springhead Spinning Co. v. Riley, L. R. 6 Eq. 551, 558."

In the case there cited with approval the vice-chancellor said (page 558):

"The jurisdiction of this court is to protect property, and it will interfere by injunction to stay proceedings, whether connected with crime or not, which go to the immediate, or tend to the ultimate destruction of proper-

ty; or make it less valuable or comfortable for use or occupation."

We find no contrary ruling to that made in the Davis & Farnum case. The subject has received general comment in several late cases, but the particular question we have was not discussed. Philadelphia v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570; Truax v. Raich, 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; Kennington v. Palmer, 255 U. S. 100, 41 S. Ct. 303, 65 L. Ed. 528; Terrace v. Thompson, 263 U. S. 197, 44 S. Ct. 15, 68 L. Ed. 255; Packard v. Banton, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. 596; Hygrade Provision Co. v. Sherman, 266 U. S. 497, 45 S. Ct. 141, 69 L. Ed. 402. In most of these cases the legislation under consideration was sustained as valid, the prosecutions were only threatened, not pending, and there was no occasion to determine the point now in mind, it was not passed on. Where a criminal prosecution results directly in the invasion and destruction of property rights, we do not doubt that it is within the power and duty of a court of equity to enjoin the administrative officer who has charge of that prosecution if there be no valid law on which the accusation rests. The claimed difference, under those conditions, between pending and threatened cases is, in our judgment, without substance. We venture to say, on the authority of the Davis & Farnum case, that it can make no difference, on the question of jurisdiction, when prosecution is begun under an invalid law, whether before or after a bill is exhibited, if there be an unlawful invasion by virtue thereof of property rights.

A temporary writ of injunction as prayed may issue in each case. The defendant may answer as he is advised.

SYMES, District Judge (dissenting in part). This case as it now stands presents two questions for consideration: First, whether the act in question violates the Constitution of the United States for any of the reasons set up in the bill; and, secondly, if the act is unconstitutional, should this court grant an injunction restraining the defendant from prosecuting the suit already instituted in the state court?

After reviewing all the authorities cited, and such others as I have thought pertinent to the issues involved, I prepared a somewhat lengthy memorandum as a basis for discussion in conference. But as I am in accord with the majority opinion in most of the conclusions announced, I do not believe it

necessary to do more at this time than to state very briefly the reasons why I regret I cannot agree with the court on the second point.

First, I am of the opinion that the statute in question is unconstitutional and void, for the reasons stated in the majority opinion.

Second, In re Sawyer, 124 U. S. 200, 8 S. Ct. 482, 31 L. Ed. 402, Fitts v. McGhee, 172 U. S. 516, 19 S. Ct. 269, 43 L. Ed. 535, Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, and the numerous cases citing and affirming these three, down to and including Hygrade Provision Co. v. Sherman, 266 U. S. 497, 45 S. Ct. 141, 69 L. Ed. 402, lay down the general rule that the Federal courts have the right to proceed without interference, when they first assume jurisdiction in a suit involving the unconstitutionality of a state act, such as in the case at bar, and to that end may restrain all proceedings, civil or criminal, in the state courts thereafter brought, and may restrain a state officer from acting under an unconstitutional act; the state law affords him no protection, as the suit in the federal court is not one against the state.

But I find no clear case in the Supreme Court holding that the federal courts can restrain criminal proceedings already pending in the state court, brought under an alleged unconstitutional state law, where the defendants can raise the federal questions, with the right to an appeal to the highest court of the state, and then to the Supreme Court of the United States in turn. I am of the opinion that the clear language of the three cases referred to above specifically prohibit such action.

Davis & Farnum v. Los Angeles, 189 U. S. 207, 23 S. Ct. 498, 47 L. Ed. 778, is cited in the cases heretofore discussed, and approves In re Sawyer and Fitts v. McGhee. The language on page 218 might be said to authorize an injunction against criminal proceedings already pending; but, granting this, I do not think it overcomes the great weight of authority, both before and after, that states the rule otherwise. For instance, In re Young, a later case, says specifically (page 162 [28 S. Ct. 455]): "But the federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court."

In conclusion, I am of the opinion that proceedings of any nature threatened to be brought under this act against these defendants should be restrained, but that the in-

junction asked for to prevent the defendant from proceeding further in the suit now pending in the state court should be denied.