### BELLAMY et al. v. MISSOURI & N. A. R. CO.

#### (Circuit Court of Appeals, Eighth Circuit. April 24, 1914.)

#### No. 3336.

1. Carriers (§ 12*)—State Regulation of Rates—Confiscatory Rates.
    Where a railroad company incorporated under the laws of a state has built and economically operates its line of road, it is entitled to earn at least sufficient to pay operating expenses, and a law of the state which will not permit it to do so is confiscatory.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

2. Carriers (§ 18*)—State Regulation of Rates—Preliminary Injunction.
    The granting of a preliminary injunction restraining the enforcement of a state law fixing passenger rates with respect to a railroad company complainant *held* within the discretion of the court, where, on the showing made, complainant put the statutory rate into effect, and, although operating its road economically, was unable to earn operating expenses.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

Appeal from the Circuit Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit in equity by the Missouri & North Arkansas Railroad Company against George W. Bellamy and others. From an order granting a preliminary injunction, defendants appeal. Affirmed.

Joseph M. Hill, of Ft. Smith, Ark., for appellants.
W. B. Smith, of Little Rock, Ark., for appellee.

Before SANBORN and CARLAND, Circuit Judges, and RINER, District Judge.

CARLAND, Circuit Judge. This is an appeal from an order granting a temporary injunction restraining the Railway Commission of Arkansas from enforcing as to appellee the two cent per mile passen-

ger rate established by the order of the Commission May 15, 1907, to carry out the provisions of an act of the Legislature of the state of Arkansas approved February 9, 1907, entitled "An Act to amend section 6611 of Kirby's Digest of the Statute of Arkansas, by fixing passenger rates in this State, and for other purposes." Laws 1907, p. 9. The order appealed from was granted December 4, 1909, and the appeal allowed January 1, 1910. The appeal, however, was not presented to this court for argument until the present term, the delay being caused as we understand it by reason of the pendency of cases in the Supreme Court involving similar questions. The order was granted upon the bill and supporting affidavits. Appellants filed what is termed a response to the motion, but no answer or plea to the bill was filed. The response was composed largely of legal argument. It denied no material facts relied upon in the bill for relief. The principal allegation of the response was as follows:

"(4) Respondents further say that complainant is not entitled to any equitable relief herein nor to an injunction against the said law prescribing a maximum passenger rate of 2 cents per mile, because its said railroad is practically an experiment, a new line just finished, constructed mostly through a rough, hilly and mountainous country, where the cost of building was great and the country unproductive and not developed, all of which was known to it at the time of such construction, that it has not been completed long enough for the revenues derived from its operations and the cost thereof to constitute a fair test of the reasonableness or unreasonableness of the rate complained of, * * * and because at least two-thirds of its mileage in the state, 178 miles from Leslie to Helena, was constructed long after the said act of February 9, 1907, reducing the passenger rate on lines of railroad over 85 miles in length from 3 to 2 cents per mile, and it knew at the time of such construction that it would not be permitted to charge more than said rate of 2 cents per mile so prescribed by said act and should not be permitted in the preliminary hearing to have an injunction in effect nullifying a law of the state of Arkansas, which was made before the construction of its line and by such construction thereafter and thereunder by it accepted as a reasonable rate and has been applied for the little time such road has been in operation."

We think therefore that all material facts which were well pleaded in the bill for the purpose of the motion stood as admitted. It is proper to observe also that the action has not been tried nor has it ever been in form for trial. The motion was addressed to the sound legal discretion of the trial court, guided by well-established principles of law and practice. The question for decision was not whether the appellee was entitled to a final decree as prayed for, but whether in the sound legal discretion of the court the two cent passenger rate should be suspended until the case could be heard upon its merits. It was necessary, of course, that the bill should state a case for equitable relief, and that great caution should be exercised by the court in granting a temporary injunction. With these principles in view let us examine the allegations of the bill.

The bill alleged that appellee was a corporation organized under the laws of the state of Arkansas, owning and operating a line of railroad extending from Joplin, Mo., to Helena, Ark. The history of the development of appellee was stated as follows:

"(4) Your orator avers: That the Missouri & Arkansas Railroad Company was incorporated under the laws of the state of Missouri regulating the or-

ganization of railroad corporations on September 21, 1880, and it constructed a line from Seligman, Mo., in the county of Barry, to the state line between the states of Missouri and Arkansas, a distance of 8.15 miles. That the Eureka Springs Railway Company was incorporated under the general laws of the state of Arkansas governing the organization and incorporation of railroad companies on the 26th of June, 1880, for the purpose of constructing a line of railroad from the state line between the states of Missouri and Arkansas to Eureka Springs in Carroll county, Ark. That during the year of 1882 the Missouri & Arkansas Railroad Company and the Eureka Springs Railway Company entered into an agreement of consolidation, and the two roads were, under proper resolutions of the boards of directors and the stockholders, consolidated under the name of the Eureka Springs Railway Company, and articles of consolidation of the two companies were filed in the offices of the Secretary of State of Missouri and Arkansas during the year 1883, and thereafter the property and rights of the Missouri & Arkansas Railroad Company passed to and were owned by the Eureka Springs Railway Company. The Eureka Springs Railway Company constructed an extension of the line of the Missouri & Arkansas Railroad Company from the state line between the states of Missouri and Arkansas to Eureka Springs, a distance of 10.35 miles, and operated the line of road from its completion in the year 1883 from Seligman, Mo., to Eureka Springs, Ark., and until it sold and transferred its line to the St. Louis & North Arkansas Railroad Company, which company was incorporated on the 25th of May, 1899, under the general laws of the state of Arkansas governing the organization and incorporation of railroad companies. The latter company acquired all of the property and rights of the Eureka Springs Railway Company and extended the line from Eureka Springs, Ark., to Harrison, in Boone county, Ark., a distance of approximately 50 miles; and thereafter extended the line from Harrison, in Boone county, Ark., to Leslie, in Searcy county, Ark., which extension was completed on September 11, 1903, and the said St. Louis & Arkansas Railroad Company thereafter, and until the extensions southeast as hereinafter set out were made by the Missouri & North Arkansas Railroad Company, operated a continuous line of railroad from Seligman, Mo., in the county of Barry, to Leslie, Ark., in the county of Searcy, a distance of 126.16 miles. That said St. Louis & North Arkansas Railroad Company was bonded for $3,065,500, said bonds representing $25,000 per mile for 122.62 miles, the distance between Seligman, Mo., and Leslie, Ark., including the spur from Freeman, Ark., to Berryville, Ark., said bonds being used in the payment of the purchase price of the Eureka Springs Railroad Company, and the construction of the extension from Eureka Springs to Leslie. Said bonds were dated March 1, 1900, running 50 years to maturity, and bearing 5 per cent. interest payable semiannually on the 1st days of January and July of each year. The Eureka Springs Railway Company, operating a mileage of only 18.50 miles under tariffs of freight and passenger constructed by it without regulation by any state authority, operated up to the time of its transfer to the St. Louis & North Arkansas Railroad Company at a profit to the stockholders above the payment of operating expenses and fixed charges. That the extension from Eureka Springs to Leslie passed through a virgin country sparsely settled, with the export business entirely undeveloped; the country was hilly and mountainous, and the grades and curves on the line were heavy, so as to make the cost of maintenance and operation large in proportion to the revenues derived therefrom. That the extension as hereinbefore alleged was completed on September 11, 1903, and thereafter the company, operating under freight tariffs prescribed by the Railroad Commission of Arkansas and charging a three cent passenger rate as then applicable under the statutes of the state of Arkansas and the orders of the Railroad Commission of said state, did not earn sufficient from intrastate and interstate business, above operating expenses, to pay the interest on its bonded indebtedness. That this bonded indebtedness of $25,000 per mile represented approximately the actual cost of construction. That the earnings did not increase in proportion to the increase of mileage. As a result, the company was unable to pay its semiannual interest accruing upon its bonds for January and July, 1905, and

January, 1906, the company having made a floating loan to meet the semi-annual interest maturing July 1, 1904. As a result, the holders of its outstanding bonds instituted foreclosure proceedings in the United States Circuit Court for the Harrison Division of the Western District of Arkansas to foreclose the lien of the deed of trust given to secure the bonds, and in said proceeding a sale of said property was made on the 16th day of June, 1906, to * * * a committee representing the bondholders, who on the 4th day of August, 1906, reorganized the company under the name of the Missouri & North Arkansas Railroad Company, under and in pursuance of the statutes of the state of Arkansas regulating the reorganization by the purchasers of any railroad purchased at judicial sale under a mortgage or deed of trust under the provisions of the acts of the General Assembly of the state of Arkansas of July 23, 1868 (Laws 1868, p. 290), and December 9, 1874 (Laws 1874-75, p. 57).

"Your orator avers: That the bondholders of the St. Louis & North Arkansas Railroad Company became the owners of the road under purchase of the committee representing them at the foreclosure sale as aforesaid, and reorganized the property under the corporate name of the Missouri & North Arkansas Railroad Company in an effort to save their investment, and in aid thereof, during the latter part of the year 1906, projected an extension of the line of road from Seligman, Mo., in a northwesterly direction to Joplin, a distance of approximately 60 miles, where it would connect with several trunk lines of road, to wit, the Kansas City Southern, St. Louis & San Francisco, the Missouri Pacific, and the Missouri, Kansas & Texas railway companies, and an extension from Leslie, Ark., in a southeasterly direction to Helena, Ark., on the left bank of the Mississippi river, a distance of approximately 178 miles, where it would connect with the Illinois Central and the St. Louis, Iron Mountain & Southern railway companies. That said extension of the line from Seligman, Mo., to Neosho, Mo., was completed and put in operation on March 1, 1908. That the extension southeast was completed and put in operation in sections, the line from Leslie to Shirley being put in operation on June 18, 1908, and within a few months thereafter to Miller, Ark., and from Miller to Georgetown about December 1, 1908, and from Georgetown to Helena, March 1, 1909."

It is then alleged: That the Legislature of the state of Arkansas on February 9, 1907, enacted a law which fixed a rate of two cents per mile for the carriage of passengers on all railroad lines in the state over 85 miles in length, which included appellee. That on May 15, 1907, the Railroad Commission of Arkansas made and promulgated an order to the same effect. That, prior to the enactment of said statute and the making of said order, appellee had charged three cents per mile for the transportation of passengers within the state of Arkansas, but that, on account of the heavy penalties prescribed by law for the violation of said statute or the order of the Commission, appellee reduced its rate for the carriage of passengers in the state of Arkansas to two cents per mile, and continued to charge that rate until the issuance of the temporary injunction in this case—a period of over two years. That appellee has at all times operated its trains in the state of Arkansas, with as great a degree of economy as was compatible with the comfort of passengers, safe and efficient service to the public, and the maintenance and preservation of its property. That all the earnings of appellee from intrastate transportation of freight and passengers in the state of Arkansas during the period that said two cent rate has been in force have not been sufficient to pay operating expenses and the cost of maintenance and fixed charges properly chargeable to said business. That the total earnings from the trans-

portation of passengers between the stations in the state of Arkansas during the fiscal year ending June 30, 1909, were $73,247.25; that the total earnings for such fiscal year from the transportation of freight between stations in said state were $84,315.44; that the earnings from the transportation of mail, express, and all other transportation sources and the nontransportation revenue of the company upon its intrastate business for the same period amounted to $15,863.86—making the total revenue from intrastate business for the fiscal year ending June 30, 1909, $173,426.55. That the total expense of operation solely incident to said business including all charges except interest charges, apportioned between interstate and intrastate business was $176,852.-23. That the total expense of operation solely incident to said passenger business in said state for the year ending June 30, 1909, including all charges except interest charges, was $73,843.13.

That the total revenues derived, which includes revenues from all sources, upon intrastate and interstate business of its entire line in operation for the fiscal year ending June 30, 1909, was.. $486,371 23

That the total operating expenses for said year were.......... $470,596 72
Taxes accrued and paid for the year......................·........ 19,274 78
Hire of equipment, net amount paid........................... 7,043 68
Rental of joint facilities, net amount paid................... 6,606 47

$503,521 65
486,371 23

Showing the net loss in operation for the year to be.......... $ 17,150 42

It is true that the expense of operation apportioned between intrastate and interstate business is upon a revenue basis, which has been held not to be an accurate way standing alone of determining the operating expense as between intrastate and interstate business; but we apprehend that where such an apportionment shows no earnings whatever above operating expense that a different mode of apportionment would not materially affect the question at issue. St. Louis & Hannibal Railroad Co. v. Knott, 230 U. S. 508, 33 Sup. Ct. 976, 57 L. Ed. 1572; Chicago Great Western Railroad Co. v. Knott, 230 U. S. 508, 33 Sup. Ct. 976, 57 L. Ed. 1572; Minnesota Rate Cases, 230 U. S. 470, 33 Sup. Ct. 729, 57 L. Ed. 1511.

The bill also contains the usual allegations as to the numerous severe penalties that will be imposed upon appellee in case it shall violate the law of Arkansas and the order of the Railroad Commission in the premises, and also that a multiplicity of suits for the recovery of penalties will arise. We think that the admitted facts present a case where appellee is not asking to earn anything for its stockholders, but simply to be allowed to earn operating expenses. The road must be operated or its charter surrendered; and we have no question here of the amount of income that appellee is entitled to earn upon the value of its property, as by the showing made there are no earnings and none are claimed above operating expenses. It is alleged, and not denied, that the business of appellee is economically administered; but it is claimed that the whole trouble arises from the extending of new and

extensive lines into undeveloped and sparsely settled country where the expense is exceedingly great. The cases of Covington & Lexington Turnpike Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560, San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892, and Simpson v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, are cited to support the proposition that, if the amount of the actual investment by a railroad company has been reckless or improvident, a loss may be sustained which the community does not underwrite. It must be observed, however, that the Supreme Court in the cases cited was speaking with reference to the amount of revenue or income to which the stockholders of a corporation would be entitled over and above legitimate operating expenses. For illustration, in Covington & Lexington Turnpike Road Co. v. Sandford, supra, it was said:

"If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens upon the public."

[1] When under the laws of the state of Arkansas individuals become incorporated for the purpose of building a railroad, and, having built the same are operating the same economically, it would seem that they would be entitled to earn operating expenses, and that a law which would not permit them to do so would be confiscatory. But the trial court was not obliged to determine finally the grave questions presented by the bill. It had no authority or power to do so in the absence of pleading and evidence, unless by agreement the case was finally submitted upon the bill alone. The trial court, upon the issue made, granted a temporary injunction upon condition that appellee execute a bond in the sum of $25,000, subject to be increased at any time upon the application of the defendants and conditioned that appellee should issue to each person purchasing a ticket or paying cash fare upon the train from one point in the state of Arkansas to another point in the same state, and confined exclusively to intrastate travel, a certificate or coupon showing the amount paid by such passenger for such ticket and the date thereof, which said certificate or coupon should be prima facie evidence of the amount paid and the time of payment, and if it should eventually be decided that the order granting the temporary injunction should not have been granted, that appellee would refund to owners and holders of the certificates and coupons issued by it the excess charges as shown by the same with interest at six per cent. per annum.

[2] If the evidence which the Supreme Court criticized in Hannibal Railroad Co. v. Knott, 230 U. S. 508, 33 Sup. Ct. 976, 57 L. Ed. 1572, Chicago Great Western Railroad Co. v. Knott, 230 U. S. 508, 33 Sup. Ct. 976, 57 L. Ed. 1572, and Minnesota Rate Cases, 230 U. S. 470, 33 Sup. Ct. 729, 57 L. Ed. 1511, was sufficient to authorize a permanent injunction, then the showing in this case ought to authorize a temporary injunction, as in each of the cases cited a net revenue over operating expenses was earned. In the case of M. & St. L. Ry. Co., the per cent. of net earnings was for the year 1907, 4.14, for 1908, 3.5, for 1909, less than 3.7.

We can come to no other conclusion but that the legal discretion confided to the trial court was properly exercised.

The order appealed from must be affirmed. And it is so ordered.