CHARLES FRANCIS ADAMS ET AL., Petitioners, *v.* TAX COURT OF PUERTO RICO, Respondent. SOL LUIS DESCARTES, TREASURER OF PUERTO RICO, Intervener.

No. 282. Argued October 1, 1952.—Decided October 29, 1952.

*Charles R. Hartzell, Rafael O. Fernández,* and *José L. Novas,* for petitioners. *Víctor Gutiérrez Franqui, Attorney General,* and *Arnaldo P. Cabrera, Assistant Attorney General,* for intervener, respondent in the main action.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

The question for decision herein is whether the tax exemption established in § 16–B of the Internal Revenue Act of Puerto Rico is applicable to a particular machinery imported and introduced into Puerto Rico by the petitioners who are alleged to be doing business as trustees under the common name "Central Aguirre Sugar Company (a trust)." The former Tax Court of Puerto Rico decided that such exemption does not cover the machinery involved herein and rendered a decision stating that the recovery of the taxes requested by the petitioners did not lie. In its findings of facts the respondent court stated that the machinery object of this suit was introduced into Puerto Rico during the term covered from April 4, 1948 to June 27, 1950, and that the taxes in the amount of $16,862.70 were paid on June 28, 1950.

In its findings of fact the Tax Court stated the following:

"According to the evidence introduced and pursuant to the findings of the court during an ocular inspection, the machinery whose taxation is the object of this controversy, is used by plaintiff in its system of storage and shipment of sugar in bulk. The machinery consists of a series of conveyers and mechanical hoisters which transport the raw sugar from the centrifugals to a scale where it is weighed and from here, moving at a speed of about two to three hundred feet per minute, it is carried to several warehouses belonging to plaintiff, the farthest of them at a distance of about nine hundred feet from the place where the centrifugals are located. One of these warehouses, the only one through which the sugar is dispatched, is built in such a way that the railroad wagons go through it and the sugar falls by gravity within the iron buckets placed on the platform of said wagons. The product is thus carried by railway to the pier where the ship with the proper machinery hoists the buckets and pours the sugar into its hold.

The product which does not go directly to this shipping warehouse is carried by the conveyers and other fixed hoisters to several other warehouses where by means of a portable ejector the sugar is stored in bulk and remains there. By means of the same apparatuses and machinery but moving then in an opposite direction, the sugar is taken out of storage and carried to the unloading warehouse and from there to the railroad wagons and to the ship. These are the same warehouses used by plaintiff to store the sugar in sacks until it was ready to be shipped, before plaintiff adopted the system of shipping in bulk."

According to the evidence introduced in the court *a quo*, the use of such machinery substituted the previous system of storing the sugar in sacks.

Before Act No. 436 of May 14, 1947 (Sess. Laws, p. 908) was amended, § 16–B of the Internal Revenue Act provided, insofar as pertinent, the following:

"There shall be exempt from the payment of the excises imposed by this Act all machinery, apparatus, or equipment that may be essential for the establishment and operation of industrial plants; ..."

On May 14, 1947, the Legislative Assembly of Puerto Rico approved Act No. 436, which applies to most of the machinery introduced by petitioners.[1] That Act No. 436 amended § 16–B as follows:

"There shall be exempt from the payment of the excises imposed by this Act all apparatus, machinery, or equipment that may be essential for the establishment and operation of industrial plants; *Provided*, That there shall be considered covered by this exemption the sub-units or major features of the said apparatuses, equipment, or machinery that may be necessary to replace other sub-units or to enlarge or improve the equipment, but there shall not be included the spare parts, parts, or accessories of the machinery or of the sub-unit whose 'cost

---

[1] As we shall see henceforth, § 16–B was amended by Act No. 195 approved on May 7, 1949 (Sess. Laws, p. 614). Up to that date the petitioners had imported 21 units of a total of 29 which were introduced as part of the machinery object of this suit. These 21 units would pay as taxes a total of $15,872.63, and the rest of the units introduced after May 7, 1949 would be taxed in the amount of $990.07.

in Puerto Rico' per individual unit may be less than twenty (20) dollars; *Provided, likewise,* That there shall be understood by sub-unit or major feature the substantial sections, parts, or accessories of the essential machinery or equipment; *Provided, finally,* That this being an exemption which covers the essential machinery for the establishment and operation of industrial plants, it shall be construed as applicable only to the machinery of the factory stage of production of the industrial process, having to do with raw materials from the beginning of the manufacturing process until completion thereof, including packing and labeling of the product; but it shall not cover the machinery, apparatuses, equipment, or vehicles used in the administrative or commercial stage of the industry; *Provided, however,* That there shall be covered by the said exemption any machinery or equipment installed in the manufacturing plant for the health of the workers or for the prevention of accidents."

On May 7, 1949 Act No. 195 was approved and it again amended § 16–B as follows:

"There shall be exempt from the payment of the excises imposed by this Act all apparatus, machinery, or equipment that may be essential for the establishment and operation of industrial plants; *Provided,* That there shall be considered covered by this exemption the sub-units or major features of the said apparatuses, equipment, or machinery that may be necessary to replace other sub-units or to enlarge or improve the equipment but there shall not be included the sub-units, spare parts, or accessories of the machinery or of the sub-unit whose 'cost in Puerto Rico' per individual unit may be less than twenty (20) dollars; *Provided, finally, likewise,* That this being an exemption which covers the essential machinery for the establishment of industrial plants, it shall be construed as applicable only to the machinery of the factory stage of production of the industrial process, having to do with raw materials from the beginning of the manufacturing process until the completion thereof, but also including the machinery, trucks, or hoisting units exclusively and permanently used in the transportation of raw material and semiprocessed articles on the premises of the industrial plant, as well as the equipment used in the packing and labeling of the product and in the preservation of the latter or of the raw material in the case of perishable articles; but

it shall not cover the machinery, apparatuses, equipment, or vehicles used in the administrative, distributional or commercial stage of the industry.

*"Provided, however,* That there shall likewise be covered by the said exemption any machinery or equipment installed in the manufacturing plant for the health of the workers or for the prevention of accidents, as well as machinery or equipment used in the operation and functioning of experimental laboratories, whether or not said laboratories operate as parts of industrial plants, as well as also the equipment used in the preliminary phase or reconnaissance of regions with a view to the mineralogical development thereof."

The amendments of 1947 and 1949 were made in order to restrict the exemption established by Act No. 77 of May 9, 1944 (Sess. Laws, p. 166) so that the apparatuses, machineries or equipment mentioned in said § 16–B would be used in the factory stage of the industry, that is, that said machinery or equipment would not only be essential for the establishment or operation of the industrial plants, but that they would also be used in the factory stage of production of the industrial process having to do with the raw material from the beginning of the manufacturing process until completion thereof. *Descartes, Treas.* v. *Tax Court; Sucn. Serrallés Int.,* 71 P.R.R. 440, 447, 448.

▇▇ The essential problem herein consists in determining whether the machinery already described is part of the factory stage of the Central Aguirre and has to do with the raw materials from the beginning of the manufacturing process until completion thereof or, contrariwise, whether it is used in the administrative or commercial stage of the industry. At the outset, the tax exemption in issue herein should be construed restrictively. *Descartes, Treas.* v. *Tax Court; Sucn. Serrallés, Int., supra; Descartes, Treas.* v. *Tax Court; Cerveceria India, Int.,* 71 P.R.R. 479, 481; *Sucn. Serrallés* v. *Tax Court,* 73 P.R.R. 33, 36. The intention of establishing tax exemptions must be clearly manifested

—*Smith* v. *Davis*, 323 U. S. 111—and should there be any reasonable doubts with an adequate ground as to whether or not the statute grants an exemption in a particular case, those doubts must be construed strictly against the claim of exemption. *Phoenix Insurance Co.* v. *Tennessee,* 161 U. S. 174; *Covington &c. Turnpike Co.* v. *Sandford,* 164 U. S. 578. Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced. *Trotter* v. *Tennessee,* 290 U. S. 354, 356. On the other hand, they are not to be read so grudgingly as to thwart the purpose of the lawmaker. *Trotter* v. *Tennessee, supra.*

After establishing the general rule to the effect that a tax exemption must be strictly construed, that every reasonable doubt must be resolved against exemption from taxation and that the burden of proof to establish the right to an exemption is upon the taxpayer, the following is stated in 51 Am. Jur. 531, § 528:

"The primary rule of construction of statutes—to ascertain and declare the intention of the legislature and carry such intention into effect—applies to the construction of enactments granting exemptions from taxation. While the intention to exempt from taxation must be determined from the language of the statute itself, which is to be construed strictly against the claim of exemption, where, by the terms of a statute, an exemption from taxation is granted, the mandate of the statute is as much entitled to obedience as one imposing taxation. The language must be given its ordinary rather than its technical meaning. The rule of strict construction, in the absence of ambiguity, does not require otherwise; nor does it mean that the courts are not to search for and ascertain, if possible, the true meaning of language used in a tax exemption statute.

"Language relating to exemption of property from taxation should be given a fair and reasonable interpretation, neither too broad nor too narrow, in order to ascertain the true intent as to its scope, and then should be strictly applied and enforced so that the limits thus defined shall not be unduly enlarged or extended. Certainly, the rule of strict construction does not call for a strained construction, adverse to the real intention of the legislature, or one so narrow and restricted as to defeat the

apparent legislative purpose. It is the duty of the court to ascertain and carry out the intent of the legislature. The rule of strict construction does not prohibit a liberal construction of the language used in order to carry out the expressed intention of the fundamental lawmakers, although it does mean that the property which is claimed to be exempt must come clearly within the provisions granting such exemption. Exemptions from taxation are not construed as including things not fairly within the meaning of the words read as they are written. The enumeration in a tax provision of certain specified things which may be exempted excludes all others not therein mentioned. ..."

Specifically referring to tax exemptions granted to manufacturing companies, in the annotations appearing in 10 A. L.R. 1273 and 116 A.L.R. 1111, it is stated that the general rule is to the effect that the statutes exempting manufacturers from taxation, as well as other exemptions which grant specific privileges, must be considered against those claiming the exemptions, but it is also stated that words used in tax exemption provisions should be taken in their ordinary signification rather than in their technical meaning and that the court must give consideration to the intent of the legislative body, and that no construction should be adopted which in effect violates the intent of the legislative body.

 Applying such standards of legal hermeneutics to the attendant circumstances, there is not only an adequate margin for reasonable doubts as to the exemption of the machinery involved herein, it being therefore defeated, but also from the very provisions of the aforesaid § 16–B, as amended by Act No. 436 of May 14, 1947 and by Act No. 195 of May 7, 1949, the fact appears that the statutory exemption does not apply to the machinery in issue. As far as the factory stage is concerned, the sugar was a finished product when it was placed in the conveyers and hoisters. The operation of that equipment is not essential to the industrial process in itself nor is it an integral part of the

factory stage of production to which the statute refers. The conveyers and mechanical hoisters do not help at all in the production of sugar and their operation is rather limited to the transportation of the sugar already manufactured. Under the aforesaid Act, in force when said machinery was introduced into Puerto Rico, the exemption does not cover the machinery used in the commercial stage of the industry. The machinery object of this suit serves as a bond or frontier between the industrial stage and the commercial stage, but it bears no function whatsoever in the final stage involving the factory termination of the article to which the statute refers. Logically, it would be better placed at the initial stage of the commercial phase.

On the other hand, upon § 16–B providing that the factory stage of production of the industrial process includes packing and labelling of the product, said provision is not applicable to the machinery involved in the case at bar.

By § 16–B as amended upon approval of Act No. 195 of 1949, the machinery used in the preservation of the product is exempted from taxation. Said concept is not applicable to the machinery in issue, inasmuch as the term "preservation" must be limited to the process needed to keep the product from decaying. *Habitch, Braun & Co.* v. *United States,* 175 Fed. 1009, 1012.

The petitioners have not adequately supported the burden of proving the existence of an exemption, which was incumbent upon them. Nor have they shown that the intention or legislative purpose has been, clearly, that of granting an exemption to machinery as the kind used in the case at bar. The fact that said exemption is not acknowledged neither destroys nor implies an aversion for the legislative intent. Contrariwise, the legislative history of § 16–B exhibits the purpose of restricting the exemption. *Descartes, Treas.* v. *Tax Court; Sucn. Serrallés, supra.* We have already seen that as § 16–B read before its amendment in 1947, any equipment or machinery which was essential for the

operation of industrial plants was exempted. But under Act No. 436 of 1947 the concept of "essentiality" was limited to that which was strictly comprised in the industrial process dealing with raw material from the beginning of the manufacturing process until the completion thereof.[2]

In *Burke* v. *Stitzel-Weller Distillery*, 145 S. W. 2d 861, it is held that under a statute exempting machinery of corporations engaged in manufacturing from taxation, the meaning of the word "manufacture" varies according to the circumstances and it is not susceptible of a definition that is all-embracing or all-exclusive, but the word must be defined as to work, as raw or partly wrought materials, into suitable forms for use, and as a general rule no article is manufactured until it has been put in condition for sale on the open market for the purposes for which it was intended to be used. It is stated that until the article is finished and ready for its final use or until it is so complete that in the ordinary course of the particular business of the corporation is ready to be put in condition for sale on the open market, the machinery which produces said articles, up to that point, must be exempted from taxation. In said case it was held that the machinery used to bottle whiskey is part of the manufacturing process and must be subject to a tax exemption applicable to machinery used in the course of the manufacturing process. However, the Kentucky statute which granted the tax exemption is more elaborate than § 16–B of

---

[2] Due to this amendment, the cases decided by this Court under § 16–B as it governed from 1944 (Act No. 77 of 1944) up to May 14, 1947, are inapposite. See *Caparra Dairy* v. *Tax Court*, 67 P.R.R. 292; *Buscaglia, Treas.* v. *Tax Court*, 67 P.R.R. 53; *Descartes, Treas.* v. *Tax Court; Sucn. Serrallés*, 71 P.R.R. 440. The new restrictive criterium embodied in Act No. 436 of 1947 is reflected in the subsequent cases where the exemption was denied, although those cases involved facts different from the ones attendant herein. See *Descartes, Treas.* v. *Tax Court; Cervecería India, Int.*, 71 P. R.R. 479; *Central Coloso* v. *Tax Court*, 70 P.R.R. 62; *Sucn. Serrallés* v. *Tax Court*, 73 P.R.R. 33, 36. In *Cervecería India, Inc.* v. *Tax Court*, 71 P.R.R. 463, the exemption was granted, under the afore-cited Act of 1947 but it dealt with electric equipment used to light and put in motion the factory stage in the process or manufacture of beer.

our Internal Revenue Act applicable to this case, inasmuch as the Kentucky Act refers to machinery used in the manufacturing process, while said § 16–B provides, in part, that the exemption must be understood as applying only to the machinery in the factory stage of production of the industrial process having to do with raw materials from the beginning of the manufacturing process until completion thereof.

The last case cited is not applicable to the case at bar. The Kentucky Act differs from ours and its coverage is more ample than that of our Act No. 77 of 1944, for the scope of the latter as we have already seen, was subsequently restricted. Furthermore, the *Burke* case dealt with the bottling of whiskey, which is different from a conveyer of sugar which is ready for use. Incidentally, see the Annotation in 172 A.L.R. 313, as to the tax exemption regarding machinery.

The decision rendered by the former Tax Court will be affirmed.

Mr. Chief Justice Todd, Jr., and Mr. Justice Sifre did not participate herein.