PRESENT: All the Justices

TOLL ROAD INVESTORS PARTNERSHIP II, L.P.

v. Record No. 250002

STATE CORPORATION COMMISSION, et al.

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
July 17, 2025

FROM THE STATE CORPORATION COMMISSION

Toll Road Investors Partnership II, L.P. ("TRIP II"), the operator of a toll road in Loudoun County, appeals from a decision of the State Corporation Commission ("the Commission") denying a toll increase. TRIP II contends that the Commission misapplied the relevant statutory criteria and, further, that denying it a toll increase would constitute an uncompensated taking in violation of the United States and Virginia Constitutions. For the foregoing reasons, we conclude that the decision of the State Corporation Commission should be affirmed.

BACKGROUND

I.     THE GREENWAY IS BUILT.

Prompted by significant population growth in the northeastern counties of Virginia, combined with a shortage of state funds to pay for expensive infrastructure, the General Assembly enacted the Virginia Highway Corporation Act of 1988. *See* Code § 56-535 *et seq.* The General Assembly found "that there is a compelling public need for rapid construction of safe and efficient highways for the purpose of travel within the Commonwealth and that it is in the public interest to encourage construction of additional, safe, convenient, and economic highway facilities by private parties." Code § 56-537. The General Assembly granted the Commission the authority to regulate toll road operators under this statute. Code § 56-542.

Loudoun County is one of the Northern Virginia counties that was projected to experience significant growth.[1] The Toll Road Corporation of Virginia ("TRCV") developed a proposal to build a toll road in Loudoun County. This road ultimately became the Dulles Greenway. The Greenway is a fourteen-mile limited-access toll road that connects Leesburg to the Dulles Toll Road. TRCV's initial projections anticipated that this toll road would cost $146 million to build. The final cost was $315 million. The road was built entirely with private funds. The proposal contemplated that tolls would start at $1.50 for each vehicle and culminate at $3.25 per vehicle in 2010. TRCV expected that, initially, 20,000 vehicles per day would use the toll road. It projected that this volume of traffic would rise to nearly 87,000 vehicles per day by 2010. In 1990, TRCV filed an application with the Commission for a permit to build and operate the road. In 1990, an analysis by Commission Staff of the financing plan for the toll road observed that "[n]ot only is the toll road's business risk high but financial risk is heightened with high debt leverage in early years." The Commission nevertheless granted TRCV approval to build the road. TRCV transferred its certificate of authority to operate the road to TRIP II. The Greenway opened in 1995.

It is worth noting that the Greenway does not charge distance-based tolls. Accordingly, toll payers must pay the full toll whether they drive the entire 14-mile road or just a portion of the road.

Over time, to relieve congestion, Loudoun County invested in its own roadway improvements, which can serve as alternatives to the Greenway. As a consequence, the time savings for users of the Greenway have fallen appreciably.

---

[1] In fact, Loudoun County's population grew from approximately 87,000 residents in 1990 to approximately 432,000 residents in 2022.

II    LOWER THAN ANTICIPATED TRAFFIC VOLUMES PROMPT DIFFICULTIES, TOLL INCREASES AND A REFINANCING OF TRIP II'S DEBT.

A.  Disappointing traffic and rising debt

From the outset, the volume of traffic on the Greenway proved to be disappointing.  The lower-than-expected traffic caused financial difficulties.  Three years after it opened, TRIP II found itself in default on some of its loans and notes.  Consequently, TRIP II has been required to refinance its debt on several occasions, in 1999 and 2005.  Zero-coupon bonds now constitute a majority of TRIP II's outstanding debt.  Zero-coupon bonds are sold at a discount and the interest accrues over the life of the bond, payable upon the bond's maturity along with the principal.  Therefore, the amount of outstanding debt increases every year until the bonds reach maturity.  The debt was structured in this way to match anticipated increases in revenue over time from traffic and toll growth.

The Commission approved both of TRIP II's debt refinancings and extended TRIP II's franchise to operate the road from 2036 to 2056.  Although the Commission approved TRIP II's refinancing of its debt, it stated in 1998 that its "approval of the refinancing plan is not a guarantee of repayment of principal or payment of interest on any securities."  The Commission further stated that "approval of this refinancing does not guarantee any particular level of tolls or toll structure.  Tolls and other fees or charges for use of the roadway will be established and revised as provided by law."  In 2005, the Commission stated that its approval of the refinancing did "not guarantee any particular level of tolls or toll structure for the Greenway."  Debt service constitutes TRIP II's largest annual expenditure.  In December of 2022, TRIP II's debt stood at $1.1 billion.

TRIP II's bond insurer requires TRIP II to place funds collected from tolls in certain accounts, including reserve accounts.  In December of 2022, TRIP II held over $207 million in

cash reserve accounts.  It has used the funds from those reserve accounts to pay for expenses, including debt service, when income was insufficient.  In 2022, TRIP II used approximately $17.6 million of its reserves to make payments on its debt.  In February 2023, TRIP II utilized approximately $11.7 million of reserves to make its debt payments.  For 2024, TRIP II anticipated that it would need to take $6.8 million from its reserves for debt service but noted that this amount could rise to $10 million.

As it was going through its first refinancing in 1999, TRIP II projected that, in 2023, the Greenway would experience approximately 128,000 trips per day and the average toll would amount to $2.48.  In 2022, however, the Greenway experienced only around 37,000 trips per day.[2]

B.  Ever-rising tolls

Problems with continued low traffic volumes prompted TRIP II to repeatedly apply for toll increases.

- In 2003, TRIP II applied to increase maximum tolls from $2.00 to $3.00.  The Commission approved the increase.

- In 2007, the Commission approved an increase of the maximum tolls from $3.00 to $4.00.

- In 2013, the Commission approved a toll increase.  The order was based on statutory criteria, since amended, that allowed toll increases based on the greater

---

[2] Witnesses identified a number of reasons for the disappointing traffic on the road, including an economic recession, the COVID pandemic, the extension of the Silver Line Metro, improvements to free alternative roads, and the rise of telecommuting.  Public comments suggest an obvious additional culprit:  the high cost of the toll.

of the change in the consumer price index plus one percent, the change in gross domestic product, or 2.8 percent.

- In 2015, the Commission rejected an application filed by a former member of the House of Delegates from Loudoun County to *lower* the tolls. On appeal, this Court affirmed that decision. *Bd. of Supervisors of Loudoun Cnty. v. State Corp. Comm'n*, 292 Va. 444 (2016).

- In 2020, TRIP II again applied to the Commission for permission to increase its maximum tolls. In response, the Commission approved increases for off-peak tolls for 2021 and 2022 but, citing uncertainty from the COVID pandemic, declined to increase the peak tolls.

C. Equity distributions

Between 2005 and 2006, TRIP II made two distributions to equity investors totaling $101,716,551. TRIP II has not made a distribution to its equity investors since 2006. The terms of the indenture impose restrictions on TRIP II's ability to provide equity distributions. Under the terms of the indenture, before TRIP II can make an equity distribution, TRIP II must meet a minimum coverage ratio ("MCR") and an additional coverage ratio ("ACR"). The MCR is calculated by dividing Net Toll Revenue by Debt Service on all Senior Bonds outstanding each year. The ACR is calculated by dividing Net Toll Revenue minus transfers to the Improvement and Operating Reserve Fund by Debt Service. The MCR and ACR must equal at least 1.25 and 1.15 each year, respectively, for funds to be available for distributions. Furthermore, the indenture contains "lock up periods" of 12 months for the MCR and 36 months for the ACR. TRIP II has not met the MCR since 2010 and has not met the ACR since 2019. These restrictions mean that even if it were granted the requested toll increase, TRIP II would not be

5

able to make any distributions to investors for at least several years. TRIP II has no current forecasts for when distributions might be made.

III.     THE GENERAL ASSEMBLY CHANGES THE STATUTORY CRITERIA FOR TOLL INCREASES.

In 2021, the General Assembly amended the criteria that govern toll increases.

Code § 56-542(D) currently provides as follows:

> The Commission also shall have the duty and authority to approve or revise the toll rates charged by the operator. . . . [T]he Commission, upon application, complaint or its own initiative, and after investigation, may order substituted for any toll being charged by the operator, a toll which is set at a level [1] which is reasonable to the user in relation to the benefit obtained and [2] which will not materially discourage use of the roadway by the public and [3] which will provide the operator no more than a reasonable return as determined by the Commission. Any proposed toll rates that fail to meet these criteria as determined by the Commission are contrary to the public interest, and the Commission shall not approve such toll rates.
>
> Any application to increase toll rates shall include a forward-looking analysis that demonstrates that the proposed toll rates will be reasonable to the user in relation to the benefit obtained, not likely to materially discourage use of the roadway, and provide the operator no more than a reasonable return. Such forward-looking analysis shall include reasonable projections of anticipated traffic levels, including the impact of social and economic conditions anticipated during the time period that the proposed toll rates would be in effect. The [Virginia Department of Transportation] shall review and provide comments upon the analysis to the Commission. Notwithstanding any other provision of law, the Commission shall not approve more than one year of toll rate increases proposed by the operator.

IV.     TRIP II SEEKS ANOTHER TOLL INCREASE UNDER THE NEW STATUTORY CRITERIA.

In 2023, TRIP II filed another application to increase its tolls, as follows:

6

| Maximum Peak Tolls | | | | | Off-Peak, Maximum Base Toll | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Hours 6:30 AM – 9:00 AM Eastbound | | | | | | | | | |
| 4:00 PM – 6:30 PM Westbound | | | | | | | | | |
| 2-Axle | 3-Axle | 4-Axle | 5-Axle | 6-Axle or More | 2-Axle | 3-Axle | 4-Axle | 5-Axle | 6-Axle or More |
| $8.10 | $16.20 | $20.25 | $24.30 | $24.30 | $6.40 | $12.80 | $16.00 | $19.20 | $19.20 |

The current off-peak toll is $5.25 for 2-axle vehicles, $10.50 for 3 axles, $13.10 for 4 axles, and $15.75 for 5 axles or more. The peak management toll for 2-axle vehicles is $5.80, $11.55 for 3 axles, $14.60 for 4 axles, and $17.50 for 5 axles or more. The requested toll increase would mean, in aggregate terms, that a commuter who drives on the Greenway five days a week during peak hours and works 48 weeks during the year would see an annual toll rise from $2,784 to $3,888, an increase of $1,104.00, or 40%.

In response to the application, the Commission issued an order that invited public comment on the application; directed the Commission Staff to investigate the application and file testimony and exhibits containing Staff's findings and recommendations; permitted interested persons to comment on the application or to participate in the proceeding as a respondent; established a date for the Virginia Department of Transportation ("VDOT") to file its comments on TRIP II's forward-looking analysis as required by Code § 56-542(D); and appointed a Hearing Examiner to conduct further proceedings and to file a report containing the Hearing Examiner's findings and recommendations.

Loudoun County as well as the Attorney General, through its Division of Consumer Counsel, opted to participate. The County and Commission Staff filed testimony, and the Division of Consumer Counsel and the VDOT submitted comments.

7

Members of the public from Loudoun County and surrounding areas submitted more than 900 written comments. The comments overwhelmingly opposed the toll increase and stated that the tolls were set at a level that discouraged use of the Greenway.

In support of its application, TRIP II submitted a report by the Steer Group, a consultancy that specializes in transportation. The detailed and technical report consists of six chapters and spans 75 pages. The report sought to demonstrate that the rise in tolls is reasonable to the user in relation to the benefits obtained. The report offers a formula seeking to quantify the benefits of using the Greenway compared to alternatives in the following categories: (1) travel time savings, (2) reliability savings, (3) vehicle operations savings, and (4) safety benefits. The Steer report labeled the resulting number a "benefit cost analysis." The Steer report also addressed the "material discouragement" prong of the statute and concluded that the increase in tolls would not materially discourage the use of the Greenway.

Experts for the County and Commission Staff concluded that the proposed toll increases do not satisfy either the "material discouragement" or the "reasonable benefit to the user" prongs of the statute. They offered a variety of critiques of the Steer report. David B. Roden, retained as an expert by the County, flagged several issues with the Value of Time factor used in the Steer report, criticized the Electronic Payment Bonus used in the Steer model, contended that Steer did not properly account for changes to the competitor road networks in its 2022 and 2024 models, and did not appropriately document how the "logit capture model" was applied. Roden "concluded that the Steer Report includes flaws that lead to biased analyses and results." Dr. Michael J. Webb, another expert retained by the County, noted that one of the variables included in the material benefits component of the Steer report, the "reliability savings," inexplicably

increased between Steer's 2019 application and its 2022 application despite the fact that travel time savings, on which reliability savings is based, decreased over that same time span.

Steven E. Smith, an analyst with the Commission's Division of Public Utility Regulation, observed that TRIP II changed the way it calculated whether the toll is "set at a level which is reasonable to the user in relation to the benefit obtained." If the benefits were calculated using the same methodology as TRIP II used in 2006, Smith observed, it would not show net benefits to the user. By injecting a new variable into the analysis, Steer purported to show a gain to the user from using the Greenway with the higher tolls. Smith concluded that Steer's benefits "analysis is overstated. The analysis includes a number of errors, deviations from U[nited States Department of Transportation] guidelines, and flawed assumptions."

Experts for the County and a witness for the Commission Staff also criticized the opacity of the Steer model because it made it impossible to verify its accuracy in various respects. Experts challenged the data Steer used on multiple fronts. Dr. Webb also criticized the Steer report for relying exclusively on full-length trips on the Greenway, without accounting for partial trips on the Greenway. Most of the trips on the Greenway, over 70 percent, are not full-length trips. The benefits to the user of increased tolls could be diminished for travelers who do not drive the entire length of the Greenway. Additionally, experts for the County and Commission Staff challenged the accident data the Steer report relied on to show that the Greenway was safer. The Steer report relied on County wide accident data, but these experts contended that the relevant data was not County roads in general but rather the alternatives that travelers use instead of the Greenway.

Roden also challenged the Steer report's material discouragement analysis. Similarly, Dr. Webb, also on behalf of the County, wrote that Steer's material discouragement "analysis is

not a properly structured causal analysis. It conflates multiple factors responsible for changes in traffic between 2022 and 2024 and presents biased results that are essentially meaningless to testing whether the proposed toll increase materially discourages use of the Greenway."

David Cuneo, on behalf of Steer, and others, offered rebuttal evidence in response to those criticisms.

Following the hearing, the parties submitted legal briefs in which they argued whether the application satisfied the statutory criteria. In addition, the parties briefed the question of whether denying the toll increase would constitute an unconstitutional taking.

The Hearing Examiner issued a lengthy and detailed report, in which he concluded that the application for a toll increase should be denied. The Hearing Examiner found that the proposed increase in the tolls did not satisfy either the "material discouragement" requirement or the requirement that tolls must be reasonable to the user in relation to the benefit obtained.

After reviewing the Hearing Examiner's report and the evidence and argument offered by the parties, the Commission issued a final order denying TRIP II's requested toll increase. The Commission held that it

> has afforded more weight to, and been persuaded by, the evidence and related arguments supporting findings that the Company failed to establish that the Proposed Tolls (1) will be reasonable to the user in relation to the benefit obtained, and (2) will not materially discourage (as that term is defined in the statute) use of the roadway by the public, both as similarly found by the Senior Hearing Examiner.

The Commission also agreed with the Hearing Examiner's conclusion "that the Proposed Tolls will provide the operator no more than a reasonable return." The Commission further held without elaboration that "constitutional considerations . . . do not necessitate approval − in

violation of the statute – of the specific Proposed Tolls that have been requested in this proceeding." This appeal followed.

ANALYSIS

This Court reviews matters of law de novo. *Syed v. ZH Techs., Inc.*, 280 Va. 58, 69 (2010). However, "the Commission's decision is entitled to the respect due judgments of a tribunal informed by experience, and we will not disturb the Commission's analysis when it is based upon the application of correct principles of law." *Appalachian Voices v. State Corp. Comm'n*, 277 Va. 509, 516 (2009). The Commission's findings of fact will not be disturbed "unless they are contrary to the evidence or without evidentiary support." *Level 3 Commc'ns of Va., Inc. v. State Corp. Comm'n*, 268 Va. 471, 474 (2004).

I.    THE COMMISSION DID NOT ERR IN REJECTING TRIP II'S APPLICATION UNDER CODE § 56-542.

To prevail on its request for a toll increase, TRIP II was required to establish (1) that the proposed toll rates "will not materially discourage use of the roadway by the public," as that concept is defined in the statute and (2) that the "proposed toll rates will be reasonable to the user in relation to the benefit obtained." Code § 56-542(D). The statute also requires the applicant to establish that the increase in the toll rates "will provide the operator no more than a reasonable return as determined by the Commission." *Id.* The first two requirements of the statute are the only ones at issue in this proceeding. TRIP II argues that the Commission erred in holding that TRIP II did not satisfy either the "material discouragement" prong or the "reasonable benefit to the user" prong of the statute. We disagree.

To satisfy the statute, a toll increase must be "reasonable to the user in relation to the benefit obtained." Code § 56-542(D). The term "reasonable" is difficult to define with precision. *See, e.g.*, *Bates v. Commonwealth*, 267 Va. 387, 394 (2004) ("[t]he concept of

11

reasonableness does not lend itself to a bright-line test"). In this context, the plain language meaning of "reasonable" is "[r]eflecting good judgment; fair and proper under the circumstances; rational, sound, and sensible." *Reasonable*, BLACK'S LAW DICTIONARY 1520 (12th ed. 2024). The statute does not contemplate a mathematical formula, although efforts to quantify benefits can be helpful, and the determination of what "proposed toll rates will be reasonable to the user in relation to the benefit obtained" includes both quantifiable and non-quantifiable benefits. A non-exhaustive list of relevant factors includes travel time savings, reliability savings, vehicle operations savings, and safety benefits when compared to alternatives. A comparison of the tolls with tolls charged by other comparable toll roads is a factor the Commission can consider. The impact of inflation, the economic circumstances of the area, and public comments are relevant as well.

The Commission could readily conclude on this record that TRIP II's proposed tolls were not set at levels that were "reasonable to the user in relation to the benefit" that the user would obtain. In support of its requested toll increase, TRIP II, which bore the burden of proof, presented highly credentialed and experienced expert witnesses who defended the Steer report and its methodology. The County and Commission Staff responded with their own highly credentialed and experienced expert witnesses who challenged the Steer report on a number of technical grounds. These expert witnesses challenged the data and findings upon which TRIP II relied in support of its proposed toll increase. This was a quintessential battle of the experts for the Commission to resolve. "The Commission is charged with the responsibility of finding the facts and making a judgment, and [t]his [C]ourt is neither at liberty to substitute its judgment in matters within the province of the Commission nor to overrule the Commission's finding of fact unless we can say its determination is contrary to the evidence or without evidence to support it."

12

*Appalachian Power Co. v. State Corp. Comm'n*, 301 Va. 257, 292 (2022) (quoting *Bd. of Supervisors of Campbell Cnty. v. Appalachian Power Co.*, 216 Va. 93, 105 (1975)). Much of TRIP II's brief is devoted to stressing the credibility of its experts and attacking the credibility of Commission Staff and the experts offered by the County. When the evidence does "little more than show that the parties' experts disagreed," this "does not render the Commission's findings contrary to the evidence." *Wal-Mart Stores E., LP v. State Corp. Comm'n*, 299 Va. 57, 74 (2020) (citation omitted). "The Commission is entitled to interpret the conflicting evidence and to decide the weight to afford it." *Id.* (citation omitted).

Credible evidence supported the conclusion that the centerpiece of TRIP II's application, the Steer report, was unpersuasive on a number of grounds. Expert witnesses from the Commission Staff and the County offered cogent criticisms of the report. The Commission also could consider the overwhelmingly negative response from the public comments. We decline to reweigh the evidence that the Commission found credible.

TRIP II further argues that the Commission's decision is arbitrary and capricious because it found certain evidence credible in this proceeding when that evidence differs from evidence it found credible in a prior toll rate proceeding. We find this argument unconvincing. Evidentiary presentations are not static. Parties to a concluded proceeding can offer new or refined evidence in later proceedings. Just because the Commission found certain evidence credible several years ago does not forever bind the Commission to accept that evidence in future proceedings. Such factfinding is in no way arbitrary or capricious. An example of this phenomenon involves accident data. Commission Staff, in assessing whether the Greenway offers safety benefits, argued that an examination of accidents on the roads that serve as alternatives to the Greenway was more relevant than accident data for roads in the entire County. The fact that the

Commission, in a prior proceeding, accepted less fine-tuned County wide accident data in no way forecloses the Commission from finding a different model more persuasive in a different proceeding. The Steer report offered by TRIP II itself differed in a number of ways from reports submitted by TRIP II in prior rate cases. That does not render it "arbitrary" either.

The Commission's conclusion that TRIP II's application did not satisfy the "reasonable benefit to the user" prong of the statute is affirmed. That alone is sufficient to affirm the Commission's denial of TRIP II's application under Code § 56-542(D). In light of our holding, we need not address the "material discouragement" prong. "Our doctrine of judicial restraint requires appellate courts to decide cases on the best and narrowest ground available." *Rebh v. Cnty. Bd. of Arlington Cnty.*, 303 Va. 379, 382 (2024) (citation and quotation marks omitted).

II. THE COMMISSION'S DECISION DOES NOT TRANSGRESS THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION.

TRIP II next argues that the Commission's refusal to grant its requested toll increase infringes the prohibition on uncompensated takings of private property. *See* U.S. Const. amend. V (providing that "nor shall private property be taken for public use, without just compensation"); Va. Const. Art. I, § 11 ("[T]he General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use. No private property shall be damaged or taken for public use without just compensation to the owner thereof.").[3] Marshaling a line of cases from the United States Supreme Court, TRIP II contends that its investors are entitled to a reasonable rate of return and to cover their expenses, including debt service, and stresses that a regulatory body is forbidden from using its power to

---

[3] The parties do not specifically address the scope of the protections offered by the Virginia Constitution and how they might differ from or overlap with those of the United States Constitution. Accordingly, we ground our decision exclusively on the United States Constitution.

14

destroy, without compensation, the value of a legal business. *See Bluefield Water Works and Improvement Co. v. Public Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944).[4]

Whether a rate is constitutionally deficient is a complex and multi-faceted inquiry.

> What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally.

*Bluefield*, 262 U.S. at 692-93; *See also Federal Power Comm'n. v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586 (1942) (Rate-making bodies are "free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances."); *Willcox v. Consol. Gas Co.*, 212 U.S. 19, 48-50 (1909) ("[C]ompensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted, and the rate expected and usually realized there upon investments of a somewhat similar nature with

---

[4] For an overview of the United States Supreme Court's approach to rate regulation, *see* Richard Goldsmith, *Utility Rates and "Takings"*, 10 Energy L. J. 241, 245-262 (1989) (tracing the Supreme Court's approach to constitutional claims in the rate regulation context).

regard to the risk attending them."). Fixing rates involves "a balancing of investor and consumer interests." *Hope*, 320 U.S. at 604. The Supreme Court has noted that States have "no duty to impose unreasonable transit fares in order simply that stockholders may earn dividends." *Covington & Lexington Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 596 (1896). The "stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored." *Id.* at 596. It is undisputed that these principles apply to companies operating toll roads. *Covington*, 164 U.S. at 594.

This case differs from a typical rate regulation case. TRIP II's predecessor built the Greenway knowing that it was taking certain risks and that the toll road would be competing against free public roads. Unlike the captive ratepayers of, for example, an electric utility, the drivers of Loudoun County can choose alternatives to the Greenway. Moreover, intervening developments, such as technological innovations that afford greater opportunities to work remotely and the County's improvements to its road network, have eroded the need to use the Greenway. The United States Supreme Court has discussed the impact of competition on rate setting, noting that

> [i]f the establishing of new lines of transportation should cause a diminution in the number of those who need to use a turnpike road, and, consequently, a diminution in the tolls collected, that is not, in itself, a sufficient reason why the corporation, operating the road, should be allowed to maintain rates that would be unjust to those who must or do use its property.

*Covington*, 164 U.S. at 596. Other market conditions are relevant as well. In *Market Street Railway Company v. Railroad Commission of California*, 324 U.S. 548 (1945), the Court rejected an argument by a streetcar company that the rates authorized by a state constituted a taking. In rejecting the argument, the Court observed that "most of our cases deal with utilities which had earning opportunities, and public regulation curtailed earnings [that were] otherwise

16

possible. But if there were no public regulation at all, this appellant would be a particularly ailing unit of a generally sick industry." *Id.* at 554. The Court took notice of the fact that the streetcar company was an entity whose "investment already is impaired by economic forces, and whose earning possibilities are already invaded by competition from other forms of transportation." *Id.*

The story told by the voluminous record before us is not that of a governmental agency dragging a profitable business down to the depths through regulatory overreach. Instead, the consistent narrative going back to the very first years of the Greenway is that of a Commission taking actions to keep afloat a business that was launched with flawed assumptions. Greenway investors anticipated a volume of trips on the Greenway that never has materialized. That faulty assumption in short order propelled the operators of the Greenway into insolvency. TRIP II then restructured its debt and borrowed heavily through, among other instruments, zero-coupon bonds – staggered bonds that could be repaid over time thanks to expected increases in traffic. These projections about traffic volumes, turned out once more to be overinflated. The Commission again and again approved toll increases, authorized two major refinancings, and granted a twenty-year extension of TRIP II's franchise to keep the Greenway from sinking.

TRIP II understandably focuses on language in United States Supreme Court cases that discusses the imperative of allowing a reasonable rate of return and that prohibits the government from destroying the value of a business by imposing rates that are confiscatory. What is abundantly clear from those cases, however, is that a reasonable rate of return and a business's solvency are not the exclusive considerations. The United States Supreme Court has plainly held that regulators can look at the overall picture and can take the concerns of ratepayers into account. *Bluefield*, 262 U.S. at 692-93.

17

The takings cases from the United States Supreme Court in this area nowhere require approval of rates and tolls that guarantee a return on investment, or even shield an entity from insolvency, no matter how flawed the entity's business plan turned out to be. Investments present opportunities for gain but also come with the risk of loss. A "reasonable" rate of return is not an ironclad guarantee of profit. It is one that is reasonable under the circumstances. To satisfy the Constitutions of the United States and Virginia, the Commission was required to take into account "many circumstances" and to fix tolls by using "fair and enlightened judgment, having regard to all relevant facts." *Id.* at 692. That is what the Commission did.

Moreover, TRIP II is not, in fact, insolvent: it possesses, for the time being, a significant cash reserve to cover shortfalls if and when shortfalls occur. As to the reasonable rate of return, even if the toll rate increase had been approved, its investors would still see no return on their investment for the foreseeable future, due to the restrictions imposed on TRIP II's ability to provide equity distributions discussed earlier in this opinion.[5] Finally, Code § 56-542(D) contemplates that TRIP II can reapply for toll increases on an annual basis if it chooses to.

We cannot say that the Commission's refusal to grant a toll increase under these circumstances constitutes a taking.

CONCLUSION

The decision of the Commission is affirmed.

*Affirmed.*

---

[5] *See* "Background" part II-C.